KELLUM, Judge.
Ellis Louis Mashburn, Jr., appeals the circuit court’s summary dismissal of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he attacked his five capital-murder convictions and his resulting sentence of death.
In 2006, Mashburn pleaded guilty to, and was found by a jury to be guilty of, five counts of capital murder in connection with the murders of his grandmother, Clara Eva Birmingham, and his stepgrand-father, Henry Owen Birmingham, Jr. Specifically, Mashburn was convicted of: (1) the murder of Mr. Birmingham during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; (2) the murder of Mrs. Birmingham during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; (3) the murder of Mr. Birmingham during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; (4) the murder of Mrs. Birmingham during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and (5) the murders of two persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. By a vote of 11-1, the jury recommended that Mashburn be sentenced to death for his capital-murder convictions. The trial court followed the jury’s recommendation and sentenced Mashburn to death. On appeal, this Court remanded the case for the trial court to issue an amended sentencing order in compliance with § 13A-5-47(d), Ala.Code 1975. After the trial court complied with our instructions on remand, this Court affirmed Mashburn’s convictions and sentence of death. Mashburn v. State, 7 So.3d 453 (Ala.Crim.App.2007). The Alabama Supreme Court denied certiorari review and this Court issued a certificate of judgment on October 24, 2008. The United States Supreme Court subsequently denied certiorari review on June 1, 2009. Mashburn v. Alabama, 556 U.S. 1270, 129 S.Ct. 2736, 174 L.Ed.2d 250 (2009).
In its amended sentencing order,[1] the trial court stated the following facts regarding the crimes:
“On the 30th day of October 2002, the bodies of Henry Owen Birmingham, Jr. and Clara Eva Birmingham were discovered in their home at 205 Melanie Lane, Alexandria, Calhoun County, Alabama. Both had been severely beaten and stabbed. It was determined that the deaths occurred during the evening hours of October 29, 2002.
“The Calhoun County Sheriffs Office, with primary assistance from the Alabama Bureau of Investigation, the Department of Forensic Sciences, undertook the investigation. The crime scene, as the evidence reflects, was extremely bloody and it was apparent that a substantial struggle had taken place between the victims and their assailant or assailants. Too, it appeared that whoever had entered the home had not done so by forcible entry against the structure itself and, inferentially, had more likely than not been admitted entry initially.
“Numerous items of evidence were collected by both the Calhoun County Sheriffs Office investigators and the Alabama Department of Forensic Sciences. The scene was kept secured and guarded for several days which enabled the DFS criminalists to study, differentiate and collect trace evidence for analysis. While the scene was in *1103 great disarray, indicating a substantial and relatively lengthy struggle, especially in light of the victims’ ages and states of health, and even though there was a large quantity of blood from the victims, DFS scientists were able to identify and recover blood spatter residue that was not from either of the victims.
“Through various leads and investigation, three suspects were identified. These persons were Ellis Louis Mash-burn, Jr., the grandson of Clara Eva Birmingham, Tony Brooks and Jeremy Butler....
[[Image here]]
“... Based upon the evidence presented, the Court finds:
“1. [Mashburn], while accompanied by at least one other individual, went to the home of Henry Owen Birmingham, Jr., and Clara Eva Birmingham in the late afternoon or early evening hours of October 29, 2006. The apparent reason for the visit was for the purpose of the theft of property and perhaps for the purpose of confronting Henry Owen Birmingham, Jr. In any event, the Birmingham home was invaded either by force or by the application of force to an occupant after entry by [Mashburn] as proven by trace evidence recovered. By testimony presented by a witness to whom [Mashburn] had said to have confessed, he and his accomplice, Tony Brooks, were armed with at least a knife and a hatchet.
“2. The fact that certain items of personal property, namely jewelry, of Clara Eva Birmingham were recovered from or were traceable to [Mash-bum] after the home invasion, the reasonable inference is that [Mash-burn] went to the Birmingham residence for the purpose of obtaining money or things of value.
“3. The bodies of Henry Owen Birmingham, Jr., and Clara Eva Birmingham were transported to the Cooper Green Hospital forensic autopsy facility where they were each subjected to a post-mortem examination by Dr. Joseph Embry, State Medical Examiner. The results of the autopsies were that each victim died from multiple stab and sharp instrument wounds and blunt-force trauma to the head. Crime scene photographs, autopsy photographs and the testimony of Dr. Embry showed that each victim suffered repeated wounds from a knife or knife-like instrument, that the wounds were vicious and delivered in such a way as to indicate an attack whereby each defended themselves and were obviously aware of the extent and nature of the attack and their impending deaths. The crime scene, too, indicated that both victims resisted attack and bore witness to the violence associated with their deaths.
“4. Whether either victim was able to appreciate the plight and suffering of the other or not, the crime scene and the autopsy findings clearly indicate each would have been aware of the soon-to-be-fatal assault being committed upon them individually.
“5. Other than [Mashburn’s] plea of guilty, the most compelling evidence was the DNA analysis and comparison of crime scene blood with that of [Mashburn] and the testimony of a former cellmate of [Mashburn], Michael Wayne Simpson. Four blood traces recovered from the scene, three in the master bedroom and one from the wall in the den, matched that of the Defendant, Ellis Mashburn, with a computed population frequency of 1:1.2 quintillion non-related white individuals and 1:1.3 quintillion non-related black individuals. To strengthen *1104 the connection of the trace evidence recovered, [Mashburn] was observed to have a fresh laceration on his left hand that he stated he had himself sewed up after ‘cutting it on a fence’ at his residence. Additionally, Michael Wayne Simpson testified that [Mashburn] had confessed to him about the killing of his grandmother and step-grandfather while accompanied by Tony Brooks. His testimony relating what he stated was told to him was confirmed by various aspects of the crime scene.”
Mashburn timely filed his Rule 32 petition on October 21, 2009, alleging that the State had suppressed evidence in violation of Brady v. Maryland, 378 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963), and that he had been denied the effective assistance of counsel during both the guilt and penalty phases of his trial. The State filed an answer and a motion to dismiss on February 9, 2010. The State argued that Mash-burn’s Brady claim was precluded by Rules 32.2(a)(2) and (a)(5), Ala. R.Crim. P., was insufficiently pleaded, and was merit-less. The State also argued that Mash-burn’s various claims of ineffective assistance of counsel relating to the guilt phase of his trial were waived by virtue of his guilty plea, were insufficiently pleaded, and/or were meritless and that Mashburn’s various claims of ineffective assistance of counsel relating to the penalty phase of his trial were insufficiently pleaded and/or were meritless. On March 3, 2010, Mash-burn filed a motion for discovery. On March 12, 2010, the State filed a motion to withhold ruling on Mashburn’s discovery request on the ground that all of Mash-burn’s claims were due to be summarily dismissed and, thus, that discovery was unnecessary.
On April 1, 2010, the circuit court issued a lengthy order summarily dismissing Mashburn’s petition. The record reflects that the parties were not notified of the circuit court’s April 2010 order until August 2011. Subsequently, Mashburn filed a second Rule 32 petition requesting an out-of-time appeal from the summary dismissal of his first petition. After a hearing, the circuit court granted Mashburn’s request for an out-of-time appeal. This appeal followed.

Standard of Review

“[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)).
“On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence.” Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008). Additionally, “[i]t is well settled that ‘the procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’ ” Nicks v. State, 783 So.2d 895, 901 (Ala.Crim.App.1999) (quoting State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993)).
Finally, Rule 32.7(d), Ala. R.Crim. P., authorizes a circuit court to summarily dismiss a Rule 32 petition
“[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose *1105 would be served by any further proceedings. ...”
I.
Before addressing the claims in Mash-burn’s petition, we first address several preliminary arguments made by Mash-burn on appeal regarding the Rule 32 proceedings. We note that the record indicates that none of these preliminary arguments were presented to the circuit court in a timely postjudgment motion. See, e.g., Loggins v. State, 910 So.2d 146, 149 (Ala.Crim.App.2005) (recognizing a motion to reconsider as a valid post-judgment motion in the Rule 32 context). See also Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003) (“The general rules of preservation apply to Rule 32 proceedings.”). However, as explained above, Mashburn did not receive notice of the circuit court’s order summarily dismissing his petition in time to file a timely postjudgment motion, making this out-of-time appeal the first opportunity for Mashburn to present these issues. Therefore, under the particular circumstances in this case, we believe that we should address Mashburn’s preliminary arguments. Cf., Calloway v. State, 860 So.2d 900, 905 (Ala.Crim.App.2002) (addressing Rule 32 petitioner’s claim raised for the first time on application for rehearing where claim could not have been raised in petition or in the initial appeal because the claim did not exist until after the initial appeal had been decided).
A.
Mashburn contends that the circuit court’s order summarily dismissing his petition was “procedurally erroneous.” (Mashburn’s brief, p. 13.) He appears to make four arguments in this regard; we address each in turn.
1.
First, Mashburn argues that “the circuit court confused what a petitioner must plead in order to survive summary dismissal with what he must ultimately establish to win on the merits.” (Issue I.A. in Mashburn’s brief, p. 13.) As a result, Mashburn contends, the circuit court erroneously placed on him a burden of proof at the pleading stage of the proceedings. According to Mashburn, all of his claims were sufficiently pleaded and entitled him to an evidentiary hearing. We disagree.
“[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must provide only ‘a clear and specific statement of the grounds upon which relief is sought.’ Rule 32.6(b), Ala. R.Crim. P. Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala. R.Crim. P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof.”
Ford v. State, 831 So.2d 641, 644 (Ala.Crim.App.2001).
In Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003), this Court explained the pleading requirements and the propriety of summary disposition as follows:
“Rule 32.3, Ala. R.Crim. P., provides, in pertinent part, that ‘[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.’ See, e.g., Fortenberry v. State, 659 So.2d 194, 197 (Ala.Crim.App.1994). Pursuant to Rule 32.6(b), Ala. R.Crim. P.:
“‘The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that *1106 a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.’
“See, e.g., Wilson v. State, 650 So.2d 587, 590 (Ala.Crim.App.1994).
“As this court has previously noted:
“ ‘ “An evidentiary hearing on a [Rule 32] petition is required only if the petition is ‘meritorious on its face.’ Ex parte Boatwright, 471 So.2d 1257 (Ala.1985). A petition is ‘meritorious on its face’ only if it contains a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a general statement concerning the nature and effect of those facts) sufficient to show that the petitioner is entitled to relief if those facts are true. Ex parte Boatwright, supra; Ex parte Clisby, 501 So.2d 483 (Ala.1986).”
‘“Moore v. State, 502 So.2d 819, 820 (Ala.1986).’
“Bracknell v. State, 883 So.2d 724, 727-28 (Ala.Crim.App.2003).
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitles a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.
“Thus, a Rule 32 petitioner is not automatically entitled to an evidentiary hearing on any and all claims raised in the petition. To the contrary, Rule 32.7(d), Ala. R.Crim. P., provides for the summary disposition of a Rule 32 petition
“ ‘[i]f the court determines that the petition is not sufficiently specific [in violation of Rule 32.6(b) ], or is precluded [under Rule 32.2, Ala. R.Crim. P.], or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by further proceedings .... ’
“ ‘ “Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.” ’ Tatum v. State, 607 So.2d 383, 384 (Ala.Crim.App.1992), quoting Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992), quoting in turn Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting); see also Rule 32.7(d), Ala. R.Crim. P.”
913 So.2d at 1125-26 (footnote omitted).
In Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), this Court explained further:
“The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003). To sufficiently plead an allegation of inef *1107 fective assistance of counsel, a Rule 32 petitioner not only must ‘identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,’ Strickland v. Washington, 466 U.S. 668, 690,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating ‘that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ 466 U.S. at 694, 104 S.Ct. 2052. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.”
950 So.2d at 356.
After thoroughly reviewing the circuit court’s order, we conclude that the court did not confuse the burden of pleading with the burden of proof. The circuit court properly applied the well recognized and heavy burden of pleading as set forth above. The circuit court’s order is 65 pages long; it contains specific written findings regarding the pleading deficiencies of each of Mashburn’s ineffeetive-as-sistance-of-counsel claims as well as specific findings regarding Mashburn’s Brady claim. For the reasons explained in Parts II and III of this opinion, we agree with the circuit court that summary dismissal of Mashburn’s petition without an evidentiary hearing was appropriate under Rule 32.7(d), Ala. R.Crim. P.
2.
Second, Mashburn argues that circuit court’s order reflects a “misuse of the summary dismissal rule.” (Issue I.B. in Mashburn’s brief, p. 17.) Specifically, Mashburn argues that, although summary dismissal of a Rule 32 petition is permitted under Rule 32.7(d), it “should be approached with great caution” and “should rarely be exercised” in capital cases. (Mashbum’s brief, p. 16.)
In support of this claim, Mashburn cites Presley v. State, 978 So.2d 63 (Ala.Crim.App.2005), for the proposition that summary dismissal in a capital case “without the benefit of expert assistance and discovery is ‘highly questionable.’ ” (Mashburn’s brief, p. 16.) However, Mashburn has mis-characterized this Court’s opinion in Presley.
In Presley, this Court reversed the circuit court’s summary dismissal of Presley’s Rule 32 petition on the ground that the circuit court’s failure to serve Presley with several of its orders had denied Presley due process. Specifically, the circuit court had issued: (1) an order summarily dismissing some of Presley’s Rule 32 claims on the ground that they were not sufficiently pleaded, but allowing Presley time to file an amendment to his petition to comply with the pleading requirements; (2) an order denying Presley’s motion for discovery, but allowing Presley time to file additional discovery motions; and (3) an order denying Presley’s request for funds for experts, but allowing Presley time to file additional requests for funds. None of the these orders were served on Presley or his counsel in a timely manner and, thus, Presley was unable to timely file additional discovery motions, additional requests for funds, or an amendment to his petition. When Presley learned of the orders, some 10 months after they had been issued, Presley requested that the circuit court vacate, the orders. The court refused, but Presley nonetheless filed new motions for discovery and for funds to hire experts, as well as a motion to amend his petition. The circuit court denied all the new motions, but scheduled an evidentiary hearing on the remaining claims in Presley’s original petition, which the State had previously conceded was necessary. However, the *1108 State subsequently filed a motion to dismiss the remaining claims in the petition, and the circuit court granted the motion and summarily dismissed the remaining claims in Presley’s petition without conducting the previously scheduled evidentia-ry hearing.
Relying on Ex parte Fountain, 842 So.2d 726 (Ala.2001), and Ex parte Weeks, 611 So.2d 259 (AIa.1992), this Court held that Presley had been denied due process when he did not receive notice of the court’s “pretrial” orders. We explained:
“The due-process principles discussed and applied in Ex parte Fountain and Ex parte Weeks were similarly violated here by the circuit court’s failure to serve Presley with copies of the circuit court’s order granting the State’s motion for partial dismissal and the orders denying his motions for discovery and for funds to retain experts, all of which granted Presley leave to amend. As soon as the court became aware that Presley had not been served with these orders, and that the deadline for amending the discovery motion had passed, the circuit court should have provided Presley with copies of the orders, and the case should have proceeded from there. The court did not do so, however, and as a result, the case took a convoluted path until it was eventually dismissed entirely without benefit of a hearing. The only adequate remedy at this point, as was the case in Ex parte Fountain and Ex parte Weeks, is to return the parties to their respective positions at the time the orders were entered in January 2002, and allow the proceedings to continue from that point.
“The State contends that any error that may have resulted from the trial court’s failure to serve Presley with the order denying his motion for discovery was cured when the trial court granted Presley the option to file a new discovery motion. Presley did, in fact, file a new motion for discovery. Presley contends that the opportunity to file the new motion did not cure the error because, when the new motion for discovery was filed, nearly all of the claims in the Rule 32 petition had already been dismissed. As the State argued in its response opposing the discovery request, Presley was not entitled to discovery on any claims that had been dismissed. (C. 641-42.) Therefore, the court’s error in failing to serve Presley with the order denying discovery was not cured. Only returning Presley to the position he was in when the error occurred will cure this due-process violation and the other violations that resulted when the court failed to serve Presley with its orders.”
978 So.2d at 68 (footnote omitted).
Although we reversed the circuit court’s judgment in Presley solely on the ground that Presley had been denied due process, in doing so this Court stated:
“We note, too, that we are concerned about the trial court’s reversal of its order setting an evidentiary hearing, a hearing the State had repeatedly acknowledged was appropriate. Based on our thorough reading of the record of the Rule 32 proceedings and of the trial record, it appears that Presley has raised valid claims of ineffective assistance of counsel at the penalty phase, and that those claims merit further investigation and careful consideration rather than summary dismissal. For example, Presley contends that he is mentally retarded and that trial counsel failed to investigate this fact and present it to the jury and judge as potential mitigation. In a reply to the State’s response opposing the motion for expert assistance, Presley included the results of an IQ test performed by the Department of Youth Services which classified *1109 him as mentally retarded with a Full Scale IQ score of 60. (C. 657.) If Presley is retarded, not only could that evidence have been considered as non-statutory mitigation, it would preclude imposition of the death sentence. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Our review of the record before us suggests that summary dismissal of this claim, without the benefit of expert assistance and discovery, was highly questionable.r
978 So.2d at 69 (emphasis on portion relied on by Mashburn).
This Court’s statement questioning the propriety of the summary dismissal of one of Presley’s Rule 32 claims was entirely dicta and was based on the specific facts and circumstances of that case. This Court did not hold, as Mashburn apparently believes, that summary dismissal in a capital case is highly questionable. Rather, this Court merely observed, after reversing the circuit court’s judgment on another ground, that the summary dismissal of one of Presley’s claims in his petition was questionable based on this Court’s review of the record. Therefore, Mashburn’s reliance on Presley is misplaced.
Contrary to Mashburn’s contention, “Rule 32 makes no provision for different treatment of death penalty cases.” Thompson v. State, 615 So.2d 129, 131 (Ala.Crim.App.1992). This is why this Court, as noted above, has repeatedly held that the preclusions in Rule 32.2 apply equally in all cases, including capital cases in which the death penalty has been imposed. See, e.g., Yeomans v. State, [Ms. CR-10-0095, March 29, 2013] — So.3d —, — (Ala.Crim.App.2013); Jenkins v. State, 105 So.3d 1234, 1239 (Ala.Crim.App.2011), aff'd, 105 So.3d 1250 (Ala.2012); Hooks v. State, 21 So.3d 772, 777 (Ala.Crim.App.2008); Brooks v. State, 929 So.2d 491, 495 (Ala.Crim.App.2005); Hamm v. State, 913 So.2d 460, 493 (Ala.Crim.App.2002); Tarver v. State, 761 So.2d 266, 268 (Ala.Crim.App.2000); Davis v. State, 720 So.2d 1006, 1013 (Ala.Crim.App.1998); and Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). Likewise, this Court has, on numerous occasions, upheld summary dismissals of Rule 32 petitions in capital cases in which the death penalty has been imposed. See, e.g., Clemons v. State, 123 So.3d 1 (Ala.Crim.App.2012); Moody v. State, 95 So.3d 827 (Ala.Crim.App.2011); Daniel v. State, 86 So.3d 405 (Ala.Crim.App.2011); Windsor v. State, 89 So.3d 805 (Ala.Crim.App.2009); Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009); Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008); Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008); McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007); Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006); Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003); and Tarver v. State, 769 So.2d 338 (Ala.Crim.App.2000).
Simply put, all the provisions in Rule 32, including the provision in Rule 32.7(d) permitting summary dismissal, apply equally to all cases, including capital cases in which the death penalty has been imposed. Whether summary dismissal of a Rule 32 petition is appropriate is dependent on the specific facts and circumstances of each individual case. Here, for the reasons explained in Parts II and III of this opinion, we conclude that summary dismissal of Mashburn’s Rule 32 petition was appropriate.
3.
Third, Mashburn argues that the circuit court erred in adopting the State’s proposed order dismissing his petition verbatim. (Issue I.B. in Mashburn’s brief.) He argues that the circuit court’s adoption of the State’s proposed order only two *1110 days after the State submitted it, coupled with the fact that the proposed order was virtually identical to the State’s answer and motion to dismiss, “implies the absence of the independent judgment that should be found clearly in any summary dismissal.” (Mashburn’s brief, p. 16.) Mashburn relies on Ex parte Ingram, 51 So.3d 1119 (Ala.2010), and Ex parte Scott, [Ms. 1091275, March 28, 2011] — So.3d — (Ala.2011), in support of his argument. However, as the State points out in its brief, both Ex parte Ingram and Ex parte Scott are clearly distinguishable from the present case and do not mandate a reversal here.
Initially, we point out that the record contains no affirmative indication that the circuit court’s order was, in fact, an adoption of a proposed order submitted by the State. The record does not contain a proposed order submitted by the State nor does the case-action-summary sheet reflect that the State ever submitted a proposed order. However, the State does not dispute on appeal that it submitted a proposed order on March 30, 2010, and that the circuit court adopted its proposed order verbatim two days later, on April 1, 2010. Therefore, for purposes of this appeal, we accept the parties’ assertions and presume that the circuit court adopted verbatim a proposed order submitted by the State.
“Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.” McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003). “While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.” Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). “[T]he general rule is that, where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court.” Ex parte Ingram, 51 So.3d at 1122.
In Ex parte Ingram, the circuit court adopted verbatim the State’s proposed order summarily dismissing Ingram’s Rule 32 petition. In the order, the court stated that it had considered “ ‘the events within the personal knowledge of the Court’ ” and that it had “ ‘presided over Ingram’s capital murder trial and personally observed the performance of both lawyers throughout Ingram’s trial and sentencing.’” Ex parte Ingram, 51 So.3d at 1123 (citation and emphasis omitted). However, the judge who had summarily dismissed the petition had not, in fact, presided over Ingram’s trial and had no personal knowledge of the trial. The Alabama Supreme Court described these errors in the court’s adopted order as “the most material and obvious of errors,” 51 So.3d at 1123, and “patently erroneous,” 51 So.3d at 1125, and concluded that the errors “undermine[d] any confidence that the trial court’s findings of fact and conclusions of law [we]re the product of the trial judge’s independent judgment.” 51 So.2d at 1125. The Court also cautioned that “appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent judgment and impartial findings and conclusions of the trial court.” 51 So.3d at 1124.
Mashburn argues that his case is similar to Ex parte Ingram in that the circuit court’s statement in its April 2010 order that it had considered the evidence presented at trial and the record from Mashburn’s direct appeal was patently *1111 erroneous because, he says, the court subsequently stated at the hearing on his second Rule 32 petition held in October 2011 that it had not considered the direct appeal but had summarily dismissed the petition based solely on the pleadings.
In the first paragraph of the circuit court’s order, the court stated:
“This matter comes before the Court on the State’s Motion to Dismiss Petitioner Ellis Louis Mashburn’s Rule 32 Petition. Upon considering Mashbum’s Rule 32 petition, the State’s Answer and Motion to Dismiss, the evidence presented at Mashbum’s trial, and the record on direct appeal, the Court finds that the State’s Motion to Dismiss is well-taken and due to be granted. Therefore, the Court ORDERS as follows. ...”
(C. 177; emphasis added.) At the October 2011 hearing on Mashburn’s second Rule 32 petition the parties and the court discussed the proper procedure for affording Mashburn an out-of-time appeal from the circuit court’s April 2010 order. After determining that Mashburn was entitled to an out-of-time appeal and that his second Rule 32 petition requesting such an appeal would be granted, Mashburn’s counsel questioned the court regarding whether the April 2010 order was, in fact, a summary dismissal and whether the court had intended to dismiss the petition without allowing Mashburn an opportunity to respond to the State’s answer and motion to dismiss. The following then occurred:
“THE COURT: It was. It was [a summary dismissal]. And I can’t tell you my exact — it was a year and a half ago. I can’t tell you my exact thought process. I may have told you — I won’t speculate too much other than probably told you that you could provide something, and I may have looked at it and felt like whatever you could provide was not — was not going to be sufficient.
“Because as I remember in this case, this was one of those situations where the attorneys made a decision in their case that they thought would be prudent to have him plead guilty before the jury and then try to get a lessor sentence, try to get a life without recommendation from the jury based on the fact that he admitted to his guilt. I don’t know.
“And then the issue too of course I haven’t seen the appeal on the case, and I don’t want to get too much into the facts, but I don’t know if there was an issue at that point alleged of incompetent counsel or anything like that because it has to be brought up either on appeal or immediately — I think all the rules say maybe the first petition, so it may have been fine to bring it up then, but I may have looked at it. But I can’t tell you if I did that or not to think that there just wouldn’t have been anything that you could have provided that would have changed my mind.
“And understand, I didn’t prosecute the case, I didn’t try the case as a judge, so my only knowledge is gathered by whatever filings that you guys provided for me. Because I think when was this case actually, when did it go to trial?
“[Assistant attorney general]: 2007. I may be confused with another ease. I’m not sure.
“THE COURT: It was 5 or 6. During that time, I belonged to the U.S. Army on immobilization [sic,] so I was not even in the courthouse. So truly there is just ignorance on my part in this case because I wasn’t around and didn’t know anything about it. So whatever I gathered, I gathered from your file.
“[Mashburn’s counsel]: No, sir. I just wanted to make sure I was correct that we were, and I understand. Your Honor, if after you said you were going to have an opportunity to respond to *1112 [the State’s answer and motion to dismiss], then you looked at it and decided—
“THE COURT: I don’t know. That’s all I can speculate to if I were to. I don’t know that for a fact because I don’t have any independent knowledge of that particular situation.”
(R. 23-25; emphasis on portion relied on by Mashburn.)
We do not agree with Mashburn that the circuit court’s statements at the October 2011 hearing indicate that the court’s statement in its April 2010 order that it had considered the evidence presented at Mashburn’s trial and the record on direct appeal was erroneous. The hearing was held some 18 months after the court had summarily dismissed Mashburn’s petition, and the judge recognized at the hearing that, because “it was a year and a half ago,” he could not remember his “exact thought process.” Although the judge initially speculated that he had not “seen the appeal on the case,” it is unclear whether this statement was a reference to the record from the direct appeal or to this Court’s opinion on direct appeal. The judge then said that he “may have looked at it. But I can’t tell you if I did that or not.” Again, although it is unclear to what this statement was referring, it appears that it may have been a reference to the record from the direct appeal. The judge also said that he had no personal knowledge of the Mashburn’s trial, and that he had considered “whatever filings [the parties] provided to [him]” and that “whatever I gathered, I gathered from your file.” The reference to “your file” indicates to us that the court had considered Mashburn’s court file, which would include the record from Mashburn’s direct appeal. Under these circumstances, we cannot say that the judge’s comments at the hearing, which admittedly were based on a limited memory, affirmatively indicate that the judge falsely stated in the order that he had considered the evidence presented at Mashburn’s trial and the record from Mashburn’s direct appeal. Because the record does not support Mashburn’s assertion that the circuit court made patently erroneous statements in its April 2010 order, this case is clearly distinguishable from Ex parte Ingram.
In Ex parte Scott, the circuit court adopted verbatim as its order the State’s answer to Scott’s Rule 32 petition. The Alabama Supreme Court stated:
“[A]n answer, by its very nature, is adversarial and sets forth one party’s position in the litigation. It makes no claim of being an impartial consideration of the facts and law; rather it is a work of advocacy that exhorts one party’s perception of the law as it pertains to the relevant facts.”
- So.3d at-. The Court then held that “[t]he trial court’s verbatim adoption of the State’s answer to Scott’s Rule 32 petition as its order, by its nature, violates this Court’s holding in Ex parte Ingram” that the findings and conclusions in a court’s order must be those of the court itself. — So.3d at-.
Mashburn argues that his case is similar to Ex parte Scott because, he says, the State’s proposed order adopted by the circuit court tracks the language of the State’s answer and motion to dismiss and, thus, “is filled with language adversarial in nature.” (Mashburn’s brief, p. 24.) However, Mashburn cites only a single word in the order that he believes is adversarial in nature, and we do not find this single word to be sufficient to indicate that the court’s findings in the order were not the product of its own independent judgment. Likewise, although Mashburn is correct that the State’s proposed order adopted by the circuit court included substantially similar language as the State’s answer and motion to dismiss, the court adopted the State’s proposed order, not the State’s answer, *1113 unlike the case in Ex parte Scott, and we do not consider the similar language in the adopted order and the State’s answer to be an indication that the court’s order was not a product of the court’s own independent judgment.
In sum, the circumstances here are substantially different than the circumstances in both Ex parte Ingram and Ex parte Scott, cases in which it was clear from the record that the orders adopted by the circuit court were not the product of the circuit court’s independent judgment. After thoroughly reviewing the record 'in this case, we cannot say that the record clearly establishes that the order signed by the circuit court summarily dismissing Mash-burn’s petition was not the product of the court’s own independent judgment. Rather, we conclude that the circuit court’s order was its own and was not merely an unexamined adoption of the proposed order submitted by the State. See Ex parte Jenkins, 105 So.3d 1250 (Ala.2012); Jackson v. State, 133 So.3d 420 (Ala.Crim.App.2009) (opinion on return to remand); McWhorter v. State, 142 So.3d 1195 (Ala.Crim.App.2011); and Miller v. State, 99 So.3d 349, 355-59 (Ala.Crim.App.2011). Likewise, for the reasons explained later in this opinion, we find that the circuit court’s findings in its order are not clearly erroneous.
4.
Finally, Mashburn states multiple times in his brief that the circuit court summarily dismissed his petition without first affording him an opportunity to respond to the State’s answer and motion to dismiss. (Issue I.B. in Mashburn’s brief.) To the extent that Mashburn intended these references in his brief to be a separate argument for relief, he has failed to comply with Rule 28(a)(10), Ala. R.App. P., which requires that an argument contain “the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.” Other than merely referencing the fact that his petition was summarily dismissed before he had filed a response to the State’s answer and motion to dismiss, Mashburn makes no argument regarding why he believes this was error, and he cites no authority for the proposition that a circuit court may not summarily dismiss a petition without first receiving from the petitioner a response to the State’s answer. Mashburn’s failure to comply with Rule 28 constitutes a waiver of this argument. See, e.g., C.B.D. v. State, 90 So.3d 227, 239 (Ala.Crim.App.2011) (“Failure to comply with Rule 28(a)(10) has been deemed a waiver of the issue presented.”).
Nonetheless, even if Mashburn had complied with Rule 28, his argument has no merit. Initially, we point out that the record does not support Mashburn’s assertion that he was not afforded an opportunity to respond to the State’s answer and motion to dismiss. As noted above, the record reflects that the State filed its answer and motion to dismiss on February 9, 2010. The circuit court did not summarily dismiss Mashburn’s petition until April 1, 2010, almost two months later. Mashburn clearly had time to file a response to the State’s answer and motion to dismiss, and nothing in the record indicates, or even suggests, that the circuit court precluded or forbade Mashburn from filing a response.[2]
*1114 Moreover, even if Mashburn did not have an opportunity to respond to the State’s answer and motion to dismiss, this Court has held that Rule 32 does not require a circuit court to permit a Rule 32 petitioner to file a response to the State’s answer or motion to dismiss. In Jenkins v. State, 105 So.3d 1234 (Ala.Crim.App.2011), aff'd, 105 So.3d 1250 (Ala.2012), this Court addressed this issue, and explained:
“Jenkins next contends the circuit court erred in denying relief on his petition before considering his reply to the State’s answer and motion to dismiss. The State argues that Rule 32 does not provide for the filing of a reply to the State’s response and that, even if it did, any error was harmless. This Court agrees with the State.
“Rule 32.6(a), Ala. R.Crim. P., provides that ‘[a] proceeding under this rule is commenced by filing a petition, verified by the petitioner or the petitioner’s attorney, with the clerk of the court.’ Rule 32.6(b), Ala. R.Crim. P., requires a petitioner to disclose the full factual basis establishing entitlement to relief, including any facts necessary to overcome the procedural bars contained in Rule 32.2, Ala. R.Crim. P.[3] See Ex parte Ward, 46 So.3d 888, 897 (Ala.2007) (‘[W]hen a Rule 32 petition is time-barred on its face, the petition must establish entitlement to the remedy afforded by the doctrine of equitable tolling. A petition that does not assert equitable tolling, or that asserts it but fails to state any principle of law or any fact that would entitle the petitioner to the equitable tolling of the applicable limitations provision, may be summarily dismissed_’). Rule 32.7(a), Ala. R.Crim. P., allows the State 30 days to file a response to the Rule 32 petition. There is, however, no provision in Rule 32 for the petitioner — who, pursuant to Rule 32.6(b), Ala. R.Crim. P., should have included the full factual basis for his request for relief and each of his legal assertions in his Rule 32 petition— to file a reply to the State’s response.
“Furthermore, there is no provision in Rule 32 that requires the circuit court to await a response from the State before dismissing a Rule 32 petition. Instead, as Alabama courts have repeatedly held, ‘Rule 32.7(d), Ala. R.Crim. P., allows the trial court to summarily dismiss a Rule 32 petition that, on its face, is precluded or fails to state a claim, and [the Ala *1115 bama Supreme Court has] held that the trial court may properly summarily dismiss such a petition without waiting for a response to the petition from the State.’ Ex parte Ward, 46 So.3d at 897 (citing Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (‘Where a simple reading of a petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition without requiring a response from the district attorney.’)).
“Recognizing these principles, this Court, in Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d —, — (Ala.Crim.App.2009), rejected Jenkins’s argument. Three days after the State filed its response to Beckworth’s Rule 32 petition and without allowing Beckworth to file a reply, the circuit court summarily dismissed Beckworth’s petition. Id. On appeal, Beckworth argued, among other things, ‘that the trial court abused its discretion when it dismissed the petition only three days after the State filed its answer.... ’ Id. This Court disagreed and held that because ‘the trial court may properly summarily dismiss a Rule 32 petition even before it receives from the State a response to the petition ...[,] [n]o error occurred as a result of the trial court’s entry of the judgment within days of its receipt of the State’s response.’ Id. See Bishop v. State, 608 So.2d at 347-48 (holding that where a simple reading of a petition for postconviction relief shows that, assuming every allegation of the petition-to be true, it is obviously without merit or is precluded, the circuit court may summarily dismiss that petition without requiring a response from the district attorney). Similarly, this Court holds that the circuit court did not err in dismissing Jenkins’s petition prior to receiving a reply to the State’s answer and motion to dismiss.”
105 So.3d at 1244-45. Therefore, we find no error in the circuit court’s summary dismissal of Mashburn’s petition without first receiving a response from Mashburn to the State’s answer and motion to dismiss.
B.
Mashburn also contends that the circuit court’s review of his claims of ineffective assistance of counsel was “infected with two independent legal errors.” (Mash-burn’s brief, p. 25.) We address each of his arguments in turn.
1.
First, Mashburn argues that the circuit court applied an erroneous legal standard in reviewing his claims of ineffective assistance of counsel. (Issue II.A.1. in Mashburn’s brief.) Specifically, Mashburn argues that, with respect to the prejudice prong of the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test, see Part III of this opinion, the circuit court erroneously “applied its own “would have changed the result’ test” (Mashburn’s brief, p. 26), instead of the “reasonable-probability-of-a-different-result” test required by Strickland. As a result, Mashburn asserts, the circuit court erroneously held him to a higher burden than required by State or federal law. The State argues, on the other hand, that the circuit court applied the proper standard for reviewing ineffective-assistance-of-counsel claims under Strickland and that its findings regarding some of Mash-burn’s claims that Mashburn had “failed to allege sufficient facts to show how alleged errors ‘would have changed the result of his trial’ does not conflict with this standard.” (State’s brief, p. 23; emphasis added.)
*1116 As explained more thoroughly in Part III of this opinion, to establish ineffective assistance of counsel, a petitioner has the burden of showing: (1) that counsel’s performance was deficient; and (2) that counsel’s deficient performance actually prejudiced the defense. To establish prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694. A defendant must show more than a “conceivable effect on the outcome of the proceeding,” but “need not show that counsel’s deficient conduct more likely than not altered the outcome in the case.” Id. at 698.
In his brief, Mashburn cites only a single page in the circuit court’s order that, he says, reflects the circuit court’s application of an erroneous legal standard.[4] Mashburn cites that portion of the court’s order addressing his claim that his trial counsel were ineffective for not presenting evidence at the guilt phase of his trial that he had acted in self-defense when he killed Mr. Birmingham. See Part III.D. of this opinion where we address this claim. In its order, the circuit court found that Mashburn had failed to plead sufficient facts indicating prejudice as to this claim, stating: “Mashburn fails to allege any facts to show how evidence that he acted in self-defense when he killed Mr. Birmingham would have changed the result of his trial.” (C. 190.) As the State correctly argues in its brief, the circuit court’s finding that Mashburn failed to allege facts indicating how counsel’s allegedly deficient performance would have changed the outcome of his trial is not inconsistent with the Strickland standard because, as noted above, showing some conceivable effect on the outcome of the trial is not sufficient to show prejudice under Strickland. Thus, to satisfy the burden of pleading a claim of ineffective assistance of counsel, a petitioner cannot merely allege that prejudice occurred or that there was some conceivable effect on the outcome of the trial; a petitioner must allege “specific facts indicating how the petitioner was prejudiced,” i.e., how the outcome of the trial would have been different. Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006). See also Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d -, - (Ala.Crim.App.2009) (upholding summary dismissal of ineffective-assistance-of-counsel claim where petitioner “failed to allege any specific facts indicating how presentation of the evidence would have changed the result at trial”), rev’d on other grounds, [Ms. 1091780, July 3, 2013] — So.3d-(Ala.2013). The circuit court did not apply an incorrect legal standard when reviewing Mashburn’s claims of ineffective assistance of counsel.
2.
Mashburn argues that the circuit court erred in considering his claims of ineffective assistance of counsel individually instead of cumulatively. (Is-(IsII.A.2. and III. in Mashburn’s brief.) Specifically, he argues that “such a piece-pieceapproach to each act or omission, without assessing counsel’s deficient per-peras a whole, contravenes U.S. Su-SuCourt and Alabama precedent.” (Mashburn’s brief, p. 29.) Mashburn cites *1117 Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Conklin v. Schofield, 366 F.3d 1191 (11th Cir.2004), Ex parte Bryant, 951 So.2d 724 (Ala.2002), and Burgess v. State, 962 So.2d 272 (Ala.Crim.App. 2005), in support of his claim.
In Taylor v. State, [Ms. CR-05-0066, October 1, 2010] — So.3d — (Ala.Crim.App.2010), this Court addressed and rejected an identical claim, explaining:
“Taylor also contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites Williams v. Taylor, 529 U.S. 362 (2000). However, this Court has noted: ‘Other states and federal courts are not in agreement as to whether the “cumulative effect” analysis applies to Strickland claims’; this Court has also stated: ‘We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.! Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005), quoted in Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d —, — (Ala.Crim.App.2010); see also McNabb v. State, 991 So.2d 313, 332 (Ala.Crim.App.2007); and Hunt v. State, 940 So.2d 1041, 1071 (Ala.Crim.App.2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R.Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor’s obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32.”
— So.3d at - (emphasis added). Thus, in considering whether Mashburn’s claims of ineffective assistance of counsel were sufficiently pleaded, the circuit court properly considered each claim individually. See, e.g., Coral v. State, 900 So.2d 1274, 1284 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005) (A “claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is an independent claim that must be sufficiently pleaded.”). See also Yeomans v. State, [Ms. CR-10-0095, March 29, 2013] — So.3d —, — (Ala.Crim.App.2013) (relying on Taylor and holding that “[w]hen considering whether the claims of ineffective assistance of counsel were sufficiently pleaded, the circuit court correctly considered each claim individually”); Washington v. State, 95 So.3d 26, 58 (Ala.Crim.App.2012) (same); Jackson v. State, 133 So.3d 420, 428 (Ala.Crim.App.2012) (“The circuit court correctly considered Jackson’s ineffective-assistance-of-counsel claims individually.”); and Moody v. State, 95 So.3d 827, 855 (Ala.Crim.App.2011) (because “all of Moody’s claims of ineffective assistance of counsel were either precluded or were insufficiently pleaded ... a cumulative-error analysis was not required.”).
Contrary to Mashburn’s contention, considering claims of ineffective assistance of counsel individually in determining whether a petitioner has met his burden of pleading is not inconsistent with United States Supreme Court or Alabama precedent. In Kyles, supra, the United States Supreme Court held that, in reviewing a claim under Brady v. Maryland, 373 U.S. *1118 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the materiality of the suppressed evidence must be determined by considering all the evidence collectively and not considering each individual piece of evidence separately. Kyles did not involve claims of ineffective assistance of counsel and is clearly not relevant, much less controlling, here. In Williams, supra, and Conklin, supra, the merits of the claims of ineffective-assistance of counsel were considered — the burden of pleading was not an issue. Ex parte Bryant, supra, was a direct appeal from a capital-murder conviction and sentence of death that involved substantive claims, not ineffective-assistance-of-counsel claims. Finally, in Burgess, supra, this Court expressly recognized the same proposition set forth in Taylor, supra: ‘“We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance.’” 962 So.2d at 297 (quoting Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005)). Although this Court made an alternative finding in Burgess that a cumulative-effect analysis of Burgess’s claims of ineffective assistance of counsel would not have entitled Burgess to relief, this alternative finding in no way establishes a requirement that claims of ineffective assistance of counsel must be considered cumulatively.
Therefore, for the reasons stated above, we find no error on the part of the circuit court in considering Mashburn’s claims of ineffective assistance of counsel individually instead of cumulatively.
II.
Mashburn contends that the circuit court erred in summarily dismissing his claim that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Issue II.B. in Mash-burn’s brief; Part IV in Mashburn’s petition.)
In his petition, Mashburn alleged that the State suppressed his pediatric medical records, which indicated that he “was a healthy baby boy” and that he was “not anoxic at birth.” (C. 18.) According to Mashburn, his mitigation specialist, Susan Wardell, compiled a social history of him which “presented the possibility that Mr. Mashburn was anoxic at birth.” (C. 18.) Mashburn asserted that his experts, neu-ropsychologist Dr. Robert Shaffer and neuropsychiatrist Dr. Thomas Sachy, “used the possibility of an anoxic birth to inform their diagnoses of Mr. Mashburn” and that the State then used his pediatric medical records at trial to impeach Dr. Shaffer and Dr. Sachy. (C. 18.) He also asserted that Wardell’s “investigation and subsequent report were called into question because she did not have Mr. Mash-bum’s medical records.” (C. 18.) Finally, Mashburn alleged that his pediatric medical records “were stored in a storage unit that was owned by Mr. Mashburn’s pediatrician,” that the State obtained these records after speaking with the wife of Mash-burn’s pediatrician, and that the State “failed to provide” these records to the defense. (C. 18.) In its order, the circuit court found this claim to be precluded by Rules 32.2(a)(2) and (a)(5) because it was raised and addressed at trial and could have been, but was not, raised and addressed on appeal. The court also found this claim to be meritless.
We have reviewed that portion of the record from Mashburn’s direct appeal relied on by the circuit court in finding that Mashburn had raised this claim at trial. Although Mashburn did object to the State’s use of his pediatric medical records on the ground that he had not received those records in discovery, Mashburn never argued that the State had suppressed the records or that a Brady violation had occurred. Therefore, we cannot agree with the circuit court that this claim is *1119 precluded by Rule 32.2(a)(2) as having been raised and addressed at trial. However, we do agree with the circuit court that Mashburn could have, but did not, raise this claim on appeal and, thus, that it is precluded by Rule 32.2(a)(5).
Mashburn’s reliance in his brief on Martin v. State, 839 So.2d 665 (Ala.Crim.App.2001), Hamilton v. State, 677 So.2d 1254 (Ala.Crim.App.1995), and Jefferson v. State, 645 So.2d 313 (Ala.Crim.App.1994), for the proposition that this Court has rejected the idea that Brady claims are subject to the preclusions in Rule 32.2 is misplaced. In all of those cases, unlike this case, the Rule 32 petitioner was not aware until after the trial had concluded— at a time that was too late to properly raise the issue in the trial court in order to properly preserve it for appellate review— that the State had allegedly suppressed evidence and, thus, the petitioners’ Brady claims could not have been properly preserved in the trial court and then raised on appeal. Therefore, Martin, Hamilton, and Jefferson are not controlling here, and we agree with the circuit court that Mash-burn’s Brady claim is precluded by Rule 32.2(a)(5) because it could have been, but was not, raised and addressed on appeal.[5]
We also agree with the circuit court’s alternative finding that Mashburn’s Brady claim is meritless. In its order, the circuit court stated, in relevant part:
“Mashburn’s medical records were equally available to the defense. There can be no Brady violation where records are equally available to the defense and the State. Broadnax v. State, 825 So.2d 134, 177-178 (Ala.Crim.App.2000). Mashburn’s medical records were in possession of his pediatrician and were, consequently, equally available to the Defense and the State....”
(C. 179-80.)
“To [establish] a Brady violation, a defendant must show that ‘ “(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.”’ Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App.1995). ‘“The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability[5] is a probability sufficient to undermine confidence in the outcome.”’ Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).”
Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998).
“The term suppression ‘means non-disclosure of evidence that the prosecutor, and not the defense attorney, knew to be in existence.’ Ogden v. Wolff, 522 F.2d 816, 820 (8th Cir.1975), cert, denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). ‘The concept of “suppression” implies that the Government has infor *1120 mation in its possession of which the defendant lacks knowledge and which the defendant would benefit from knowing.’ United States v. Natale, 526 F.2d 1160, 1170 (2d Cir.1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976).”
Donahoo v. State, 552 So.2d 887, 895-96 (Ala.Crim.App.1989).
“ ‘Because the government’s duty to disclose covers only evidence within the government’s possession, the government is not obliged to furnish information already known by the defendant, or information, evidence, or material that is available or accessible to the accused, which the defendant could obtain by exercising reasonable diligence. Discovery is also not required where the defendant knows of the essential facts permitting one to take advantage of the evidence.’
“22A C.J.S. Criminal Law § 667. ‘Prosecutors have no duty under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose evidence available to the defense from another source.’ Hurst v. State, 469 So.2d 720, 723 (Ala.Crim.App.1985). See also Brown v. State, 982 So.2d 565 (Ala.Crim. App.2006); McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003); Gardner v. State, 530 So.2d 250 (Ala.Crim.App.1987).”
Vanpelt v. State, 74 So.3d 32, 69-70 (Ala.Crim.App.2009). Here, it is abundantly clear that Mashburn’s own pediatric medical records were as equally available to him as they were to the State and that he could have obtained those records through the exercise of reasonable diligence. Therefore, there was no Brady violation.
For these reasons, the circuit court’s summary dismissal of Mashburn’s Brady claim was proper.
III.
Mashburn also contends that the circuit court erred in summarily dismissing his claims of ineffective assistance of counsel.
“[W]hen reviewing a petitioner’s claims of ineffective assistance of counsel, we apply the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). The petitioner must establish: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by counsel’s deficient performance.
“ ‘First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.’
“Strickland, 466 U.S. at 687.
“ ‘To meet the first prong of the test, the petitioner must show that his counsel’s representation fell below an objective standard of reasonableness. The performance inquiry must be whether counsel’s assistance was reasonable, considering all the circumstances.’ Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987). ‘ “This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before de *1121 termining whether counsel rendered ineffective assistance.” ’ Lawhorn v. State, 756 So.2d 971, 979 (Ala.Crim.App.1999) (quoting Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992)). ‘A court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.’ Strickland, 466 U.S. at 689.
“ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” See Michel v. Louisiana, [350 U.S. 91], at 101 [(1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland, 466 U.S. at 689.
“ ‘[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (“We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.”). We recognize that “[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.” Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.” Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).’
“Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (footnotes omitted).
“To establish the second prong of the test, ‘[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ Strickland, 466 U.S. at 694. ‘A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id. ‘It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.’ Id. at 693. ‘When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, *1122 absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ Id. at 695.”
Bryant v. State, [Ms. CR-08-0405, February 4, 2011] — So.Sd —, — (Ala. Crim.App.2011).
The burden of establishing the two-pronged Strickland standard is particularly stringent when a defendant enters a guilty plea, because a defendant must establish that, but for counsel’s errors, he or she would not have pleaded guilty but would have insisted on going to trial. As the United States Supreme Court explained in Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985):
“We hold, therefore, that the two-part Strickland v. Washington[, 466 U.S. 668 (1984),] test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in Tollett v. Henderson, [411 U.S. 258 (1978),] and McMann v. Richardson, [397 U.S. 759 (1970) ]. The second, or ‘prejudice,’ requirement, on the other hand, focuses on whether counsel’s constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the ‘prejudice’ requirement, the defendant must show that there is a reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.
“In many guilty plea cases, the ‘prejudice’ inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error ‘prejudiced’ the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the ‘prejudice’ inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. See, e.g., Evans v. Meyer, 742 F.2d 371, 375 (C.A.7 1984) (‘It is inconceivable to us ... that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received’). As we explained in Strickland v. Washington, supra, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the ‘idiosyncrasies of the particular decisionmaker.’ Id., 466 U.S., at 695.”
474 U.S. at 58-60. See, e.g., Ex parte Coleman, 71 So.3d 627, 632 (Ala.2010); Frost v. State, 76 So.3d 862 (Ala.Crim.App.2011); and Connally v. State, 33 So.3d 618, 622-23 (Ala.Crim.App.2007).
Bearing in mind these principles as well as the burden of pleading as set forth in Part I.A. of this opinion, we turn to Mash-burn’s claims.

*1123
Guilt-Phase Ineffective-Assistance Claims

As noted above, Mashburn pleaded guilty to the five counts of capital murder levied against him. Pursuant to § 13A-5-42, Ala.Code 1975, a jury was empaneled and found Mashburn guilty of all five counts of capital murder. In his petition, Mashburn alleged virtually no facts regarding the circumstances of the crimes or the State’s evidence against him. Although Mashburn did list in his petition the names of 14 prosecution witnesses who testified against him at the guilt phase of his trial, he included only one- or two-sentence summaries of the witnesses’ testimony, followed by conclusory statements that his counsel did not object to the testimony.
For example, Mashburn stated that “Henry Birmingham, the son of Mr. Birmingham, ... testified about his father and his father’s good character” and that counsel did not object to this testimony or cross-examine the witness (C. 12), but Mashburn failed to allege what Henry Birmingham said about his father or his father’s character. Mashburn stated that “Donald Sparks, the first officer who arrived at the scene ... testified as to what he saw at the crime scene and how he secured the scene” and that his counsel did not object to this testimony or cross-examine the witness (C. 13), but he failed to allege what Sparks said about what he actually saw at the scene or what he did to secure the scene. Mashburn alleged that “Larry Amerson, the county sheriff, ... testified about the initial investigation, the crime scene, and also introduced a crime scene log” and that counsel did not object to this testimony or cross-examine this witness (C. 13), but he failed to allege any facts regarding the initial investigation as testified to by Sheriff Amerson. Mash-burn alleged that “Marvin Southard, an assistant coroner for Calhoun County, ... testified as to the cause of death of the victims” (C. 13) and that “Dr. Joseph Em-bry, forensic pathologist, ... identified the cause of death of Mr. and Mrs. Birmingham” (C. 14), and that counsel did not object to the testimony or cross-examine these witnesses. However, he failed to state in his petition what the victims’ causes of death actually were. Mashburn also alleged that “Alex Ferrance, a former sheriffs deputy, ... testified about the statement he took from Mr. Mashburn” and that counsel did not object to this testimony or cross-examine this witness (C. 13), but he failed to allege any facts regarding the circumstances surrounding the statement or what testimony was presented at his trial regarding the contents of that statement. Mashburn further alleged that “Danny Conway ... interviewed and notified Mr. Mashburn about the death of his grandmother and testified as to his demeanor [and] testified to Mr. Mashburn’s answer as to his whereabouts at the time of the murder” and that counsel did not object to this testimony or cross-examine this witness. (C. 13-14.) However, Mashburn failed to allege what Conway said regarding Mashburn’s demeanor or where Mashburn told Conway he was at the time of the murders. Finally, Mashburn stated:
“Lynde Green, chief investigator with the Sheriffs office, ... testified about the pictures she took of the scene and identified them for the court. She also testified that she took statements from the neighbors and family. Specifically, she spoke with Mr. Mashburn after she received a tip concerning his involvement in the crimes and testified about this interview with Mr. Mashburn and his girlfriend, Jamie Cuneo. She further testified about jewelry she found at Ms. Cuneo’s home and identified the jewelry. [Trial counsel] cross-examined Ms. Green regarding the involvement of *1124 Tony Brooks and Jeremy Butler in the murders of Mr. and Mrs. Birmingham.”
(C. 13; footnote omitted.) Mashburn failed to allege, however, what Lynde Green’s testimony was regarding her interview with Mashburn and his girlfriend. He also failed to allege any facts indicating the type or extent of participation in the murders of Tony Brooks and Jeremy Butler.
This Court may take judicial notice of its own records, see note 1, supra; however, we are not required, in the context of a Rule 32 proceeding, to search the record from a petitioner’s direct appeal to ascertain the factual basis for a postconviction claim. See Moody v. State, 95 So.3d 827, 853 n. 18 (Ala.Crim.App.2011). As noted above, the full factual basis for the claim must be included in the petition itself. Thus, we address Mashburn’s claims of ineffective assistance of counsel relating to the guilt phase of the trial in light of Mashburn’s failure to allege any specific facts regarding the evidence presented by the State against him.
A.
Mashburn first contends that the circuit court erred in finding that his claims of ineffective assistance of counsel relating to the guilt phase of the proceedings had been waived by the entry of his guilty pleas because, he says, his pleas were not knowingly and voluntarily entered. (Issue II.C. in Mashburn’s brief.)
As it relates to the voluntariness of his guilty pleas, this claim was not properly preserved for appellate review. Nowhere in his petition did Mashburn raise a claim that his guilty pleas were involuntary. Although generally “challenges to the voluntariness of a guilty plea may be presented for the first time in a timely filed Rule 32 petition,” Murray v. State, 922 So.2d 961, 965 (Ala.Crim.App.2005), such challenges are not considered jurisdictional issues. See, e.g., Fincher v. State, 837 So.2d 876, 878 (Ala.Crim.App.2002) (a challenge to the voluntariness of a guilty plea is not jurisdictional). Thus, they are subject to the general rules of preservation, which “apply to Rule 32 proceedings.” Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003). It is well settled that “[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997). Because Mashburn did not challenge the vol-untariness of his guilty pleas in his Rule 32 petition, this claim was not properly preserved and is, therefore, not properly before this Court for review.
As it relates to the circuit court’s finding that Mashburn’s claims of ineffective assistance of counsel relating to the guilt phase of his trial were waived by entry of his guilty pleas pursuant to § 13A-5-42, Ala. Code 1975,[6] we find it unnecessary to address the effect § 13A-5-42 has on post-conviction claims of ineffective assistance of counsel at the guilt phase of a capital trial because, as explained below, we agree with the circuit court’s alternative findings that all of Mashburn’s claims relating to *1125 counsel’s effectiveness at the guilt phase of his trial were insufficiently pleaded.
B.
Mashburn contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not challenging the robbery and burglary aspects of the crimes. (Issue II.D.1. in Mashburn’s brief; Part V.A. in Mashburn’s petition.)
In his petition, Mashburn alleged that his trial counsel possessed information that a second house owned by Mrs. Birmingham, where she kept some of her personal items, including clothing and jewelry, had been burglarized a few months before the murders and jewelry had been stolen. Mashburn alleged that Mrs. Birmingham had reported the burglary to the police and had filed a claim with her insurance company regarding the stolen jewelry. According to Mashburn, his trial counsel should have introduced evidence “that many, if not all, of the items supposedly stolen from the Birminghams’ house on the night of the crime may have been stolen from Mrs. Birmingham’s old house prior to October 29, 2002.” (C. 21.) Mashburn alleged that Jean Moncus could have testified during the guilt phase of the trial — as she had during the penalty phase of the trial — that she “was not sure whether the jewelry allegedly stolen at the time of the murders was actually stolen on the night of the murders or was stolen from Mrs. Birmingham’s other house in a burglary a few months earlier.” (C. 21.) Mashburn also alleged that Laraine Scott could have testified that after the murders she found gold and diamond earrings and a necklace on the bathroom counter in the Birming-hams’ home. Crime-scene photographs, Mashburn said, also showed jewelry “sitting out at the Birmingham home after the murders.” (C. 22.)
Evidence that jewelry was left at the Birminghams’ house after the murders, coupled with evidence that some of Mrs. Birmingham’s jewelry had been stolen in an earlier burglary and not the night of the murders, Mashburn alleged, would have undercut the prosecution’s theory that Mashburn’s motive for the murders was pecuniary, would “have undermined the prosecutor’s theory that Mr. Mashburn had gone to the Birminghams’ house to commit robbery,” and would have “contradicted the prosecution’s robbery and burglary cases.” (C. 22.) Mashburn concluded that he was “severely prejudiced” by counsel’s not presenting this evidence because, he said, “[h]ad this evidence been presented at trial, not only would four of the five capital murder counts have been dismissed, the use of the robbery and burglary counts as aggravating factors against Mr. Mashburn in the sentencing phase of the trial would also have been unavailable.” (C. 23.)
Although Mashburn alleged that “much, if not all,” of the jewelry stolen from Mrs. Birmingham “may have been” stolen in a previous burglary, he did not identify in his petition a single piece of jewelry he believed had been stolen in the earlier burglary and not on the night of the murders, and he claimed only that the jewelry “may have been ” stolen on a previous occasion. Speculation is not sufficient to satisfy a Rule 32 petitioner’s burden of pleading. In addition, although Mashburn did allege that Jean Moncus could have testified that she “was not sure whether the jewelry allegedly stolen at the time of the murders was actually stolen on the night of the murders or was stolen from Mrs. Birmingham’s other house in a burglary a few months earlier” (C. 21), such uncertainty does not indicate that no jewelry was stolen the night of the murders. Likewise, Laraine Scott’s alleged *1126 testimony that there was still jewelry in the house after the murders does not indicate that no jewelry was stolen during the murders.
Additionally, as noted above, Mashburn pleaded virtually no facts in his petition regarding the facts and circumstances of the crimes. Absent any factual pleadings regarding the specific facts and circumstances of the crimes or the evidence presented during the guilt phase of the trial, it is impossible to determine whether, even accepting Mashburn’s factual allegations as true, Mashburn would be entitled to relief on this claim. Therefore, Mashburn failed to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), and summary dismissal of this claim of ineffective assistance of counsel was proper.
C.
Mashburn also contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not pursuing the defense of voluntary intoxication. (Issue II.D.2. in Mashburn’s brief; Part V.B. in Mashburn’s petition.)
In his petition, Mashburn alleged that, “at the time of the crime, [he] had been on methamphetamine,” “had slept little, if at all, for approximately 4-5 days,” and “was also under the influence of prescription drugs.” (C. 23.) Mashburn asserted that his trial counsel “failed to raise a voluntary intoxication argument that could have been asserted to negate that he went to Mr. and Mrs. Birmingham’s home with the intent to commit a robbery and burglary” and to show that he was, “at most, reckless in his participation in the crimes.” (C. 24.) According to Mashburn, counsel’s “failure to present this evidence that [he] was intoxicated during the crimes deviated from the reasonable standard of professional conduct” and prejudiced him because, he said, “[h]ad this evidence been presented at trial, it is likely [the] burglary and robbery claims would have been dismissed because his intoxication prevented him from having the specific intent to commit theft” and because, he said, “the jury may have been instructed to consider a lesser included offense.” (C. 24.)
This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Mashburn failed to allege how much methamphetamine he had taken, how much or what prescription drugs he had taken, or exactly when he had taken the methamphetamine and prescription drugs. Mash-burn’s bare allegation that he had taken some undisclosed amount of methamphetamine and unidentified prescription drugs at some undisclosed point in time in the days preceding the murder is simply not sufficient to establish that Mashburn was intoxicated to the point of being unable to form the intent to commit a theft or to form any other intent. “[EJvidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication.” Pilley v. State, 930 So.2d 550, 562 (Ala.Crim.App.2005). “[T]here must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.” Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001). See also Spencer v. State, 58 So.3d 215, 231-32 (Ala.Crim.App.2008); Harris v. State, 2 So.3d 880, 910-912 (Ala.Crim.App.2007). Indeed, voluntary intoxication is not a defense “unless the degree of intoxication amounts to insanity.” Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), affd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Mashburn failed to plead sufficient facts to *1127 indicate that voluntary intoxication would have been a viable defense or that he would have been entitled to jury instructions on voluntary intoxication or any lesser-included offenses; thus, he failed to plead sufficient facts indicating that his trial counsel were ineffective in this regard. See, e.g., Connally v. State, 33 So.3d 618, 622-23 (Ala.Crim.App.2007). Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
D.
Mashburn next contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not presenting evidence that he had acted in self-defense when he killed Mr. Birmingham. (Issue II.D.3. in Mashburn’s brief; Part V.C. in Mashburn’s petition.)
In his petition, Mashburn alleged:
“Mr. Mashburn told [trial counsel] of facts that would have supported asserting a theory of self-defense at trial as to the charges relating to Mr. Birmingham. Mr. Mashburn told [trial counsel] that, on the night of the murders, he had gone to the Birminghams’ home to use the telephone. According to Mr. Mash-burn, Mr. Birmingham became upset with Mr. Mashburn for visiting the house after dark and events then escalated to the point that Mr. Birmingham threatened and struck Mr. Mashburn.
“Other evidence presented at trial could lend support to this self-defense theory. At trial, testimony was presented that Mr. Birmingham did not like visitors at his home after dark and was easily upset by such visitors. Evidence was also presented that Mr. Birmingham had a tense relationship with Mr. Mashburn and had been in arguments with Mr. Mashburn prior to the night of the murders.
“[Trial counsel’s] failure to introduce evidence at trial supporting a theory that Mr. Mashburn acted out of self-defense as to the counts relating to Mr. Birmingham severely prejudiced Mr. Mashburn’s defense. Such evidence would have likely created a reasonable doubt as to whether Mr. Mashburn was guilty of the capital murder of Mr. Birmingham.”
(C. 24-25.)
At the time of the crimes, § 13A-3-23, AIa.Code 1975, provided,[7] in relevant part:
“(a) A person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose. A person may use deadly physical force if the actor reasonably believes that such other person is:
“(1) Using or about to use unlawful deadly physical force; or
“(2) Using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling; or
“(3) Committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree, forcible rape or forcible sodomy.
“(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon *1128 another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety:
“(1) By retreating, except that the actor is not required to retreat:
“a. If he is in his dwelling or at his place of work and was not the original aggressor; or
“b. If he is a peace officer or a private person lawfully assisting a peace officer at his direction.”
Mashburn’s bare allegations that Mr. Birmingham “threatened and struck” him and that he and Mr. Birmingham had a “tense” relationship are not sufficiently specific to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Mashburn did not allege in his petition that he reasonably believed that Mr. Birmingham was about to use unlawful deadly physical force or to commit a first- or second-degree assault against him. Mashburn also failed to allege any facts indicating that he could not have retreated with complete safety from the alleged confrontation with Mr. Birmingham or, alternatively, that he had no duty to retreat. Simply put, Mashburn failed to allege sufficient facts indicating that he did, in fact, act in self-defense when he killed Mr. Birmingham. Therefore, Mashburn failed to plead sufficient facts indicating that his trial counsel were ineffective for not presenting evidence of self-defense, and summary dismissal of this claim of ineffective assistance of counsel was proper.
E.
Mashburn also contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not objecting to the admission of crime-scene and autopsy photographs. (Issue II.D.4. in Mash-burn’s brief; Part V.D. in Mashburn’s petition.)
In his petition, Mashburn alleged that his trial counsel were ineffective for not objecting to “49 graphic crime scene photographs, including 13 color photographs of Mr. Birmingham’s dead and bloodied body and 13 photographs of Mrs. Birmingham’s dead and bloodied body,” as well as “36 photographs from Mr. and Mrs. Birmingham’s autopsies, including seven close-up photographs exclusively detailing multiple stab wounds to Mr. Birmingham’s head and neck and six photographs exclusively detailing multiple stab wounds to Mrs. Birmingham’s head.” (C. 25.) Mashburn asserted that the number of photographs was “overwhelmingly cumulative” and that their admission was “extremely prejudicial” because, he said, they “undoubtedly inflamed the jury.” (C. 25.) Mashburn also alleged that the prejudice to him “was especially heightened by the fact that members of the victims’ family were in the courtroom when the photographs were shown and left the courtroom in tears after their presentation.” (C. 25.) Finally, Mashburn alleged that “[h]ad these photographs not been on display for the jury, they would not have become inflamed by the images depicted and would have been able to render a just verdict.” (C. 26.)
This claim does not satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b). Although Mashburn alleged that counsel should have objected to the crime-scene and autopsy photographs, he failed to plead in his petition what objection he believed counsel should have made that would have resulted in the photographs being excluded. Cf., Daniel v. State, 86 So.3d 405, 423 (Ala.Crim.App.2011) (Rule 32 petitioner failed to satisfy pleading requirements regarding claim that counsel was ineffective for not objecting to admission of shoe prints where petitioner “failed to plead what objection counsel could have made that would have resulted in the shoe *1129 prints being excluded”). Nor did Mash-burn plead any facts in his petition even suggesting that the photographs were inadmissible for any reason. Mashburn described the photographs as “graphic,” “horrific,” and “cumulative.” However, “Alabama courts have held on many occasions that photographs of the crime scene and the victims are admissible, even though they might be gruesome and cumulative, if they shed light on an issue being tried.” McGahee v. State, 885 So.2d 191, 214 (Ala.Crim.App.2003). See also Ex parte Bankhead, 585 So.2d 112, 118-19 (Ala.1991) (admission of photographs of 59 stab wounds to victim’s body were properly admitted), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Mashburn alleged no facts indicating that the photographs were not relevant, i.e., that they did not shed light on, the issues being tried. Because Mash-burn failed to plead any facts indicating that the photographs were inadmissible or indicating what objection he believed counsel should have made that would have resulted in the photographs being excluded, he failed to plead sufficient facts indicating that his trial counsel were ineffective in this regard. Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
F.
Mashburn next contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not moving for a change of venue. (Issue II.D.5. in Mash-burn’s brief; Part V.E. in Mashburn’s petition.)
In his petition, Mashburn alleged that “evidence existed to suggest the community had been saturated with widespread publicity of these murders, as a majority of the jury venire admitted that they had heard of the murder trial in the newspaper or on television.” (C. 26.) He also asserted that “[n]umerous newspaper articles were published in Calhoun County before and during the trial relating to the murders and the parties involved in both the investigation and legal process,” which, he said, “saturated the community with information relating to Mr. Mashburn’s case and significantly decreased his ability to have a fair and impartial jury.” (C. 26.) Mashburn further alleged that “Calhoun County was a small community” and that “both the victims were from Calhoun County.” (C. 26.) If not for counsel’s not filing a motion for a change of venue, Mashburn concluded, his “trial would have been moved to a venue where he would not have been subjected to a partial jury that was saturated with pretrial publicity, and the outcome of his case would have been different.” (C. 27.)
This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b). “Before a change of venue is warranted, the community must be saturated with prejudicial publicity or there must be actual prejudice against the defendant.” Moody v. State, 95 So.3d 827, 845 (Ala.Crim.App.2011). Although Mashburn made a bare allegation that there were “numerous” newspaper articles regarding the crimes and the trial, he failed to plead any facts regarding the nature of the articles that would indicate that the articles were biased or prejudicial. He also asserted that the newspaper articles “saturated the community with information,” but failed to allege any specific facts in support of this conclusory statement. In addition, Mashburn made a bare assertion that “a majority” of the venire had heard about the case, but he failed to allege how many prospective jurors had actually heard about the case and he did not identi *1130 fy a single juror who sat on his jury who had read or heard about the case. Contrary to Mashburn’s contention, “the existence of widespread publicity does not require a change of venue.” McGahee v. State, 885 So.2d 191, 211 (Ala.Crim.App.2003). Because Mashburn failed to allege sufficient facts in his petition indicating a reasonable probability that a change of venue would have been granted had counsel filed a motion requesting a change of venue, he failed to plead sufficient facts indicating that his trial counsel were ineffective for not moving for a change of venue. Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
G.
Mashburn also contends that the circuit court erred in summarily dismissing on pleading grounds his claim that his trial counsel were ineffective for not challenging the State’s case during the guilt phase of the trial. (Issue II.D.6. in Mashburn’s brief; Part V.F. in Mashburn’s petition.) In his petition, Mashburn alleged:
“As discussed more fully above, even though Mr. Mashburn pleaded guilty to the charges against him in this case, the prosecution was still required to present evidence against him in the guilt phase of trial. However, throughout the prosecution’s presentation of evidence during the guilt phase, [trial counsel] failed to object to the presentation of inadmissible and privileged evidence, and also failed to cross-examine almost all of the witnesses called by the prosecution. This failure to provide a defense for Mr. Mashburn is a violation of his constitutional rights, and resulted in Mr. Mash-burn receiving the death penalty.”
(C. 27.)
Mashburn alleged no other facts regarding this claim. Mashburn did not specifically identify within this claim what evidence he believed his counsel should have objected to, what objection he believed should have been made, or why he believed the unidentified evidence was inadmissible. He also did not identify within this claim which witnesses he believed counsel should have cross-examined but did not or what questions he believed counsel should have asked on cross-examination. Mashburn made a vague reference to what he “discussed more fully above” but did not specify what he was referring to. To the extent that this ambiguous reference was to that portion of his petition in which he listed the names of prosecution witnesses who testified against him and provided a one- or two-sentence summary of their testimony, as noted above, Mashburn failed to plead with any specificity the content of those witnesses’ testimony. In addition, Mashburn made only bare and conclusory statements that his counsel did not object to the testimony or cross-examine the witnesses, without providing any specific facts regarding the objections he believed should have been made or the questions he believed counsel should have asked on cross-examination. Therefore, Mashburn clearly failed to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), and summary dismissal of this claim of ineffective assistance of counsel was proper.
H.
Mashburn next contends that the circuit court erred in summarily dismissing on pleading grounds the claim in his petition that his trial counsel were ineffective for allegedly giving him erroneous advice that he was not allowed to withdraw his guilty pleas. (Issue II.D.7. in Mashburn’s brief; Part V.G. in Mashburn’s petition.)
In his petition, Mashburn alleged:
“Subsequent to pleading guilty to the charges of capital murder, Mr. Mash- *1131 burn indicated he wanted to change his guilty plea to not-guilty, but was informed he could not. This advice was incorrect, as Mr. Mashburn had up to thirty (30) days after his sentence was pronounced to move to withdraw his plea. See Ala. R.Crim. P. 14.4(e); see also Dooley v. State, 26 So.3d 499 (Ala. Crim.App.2009). Accordingly, had he been allowed to seek withdrawal of his pleas, there is a reasonable probability the outcome of his trial would have been different.”
(C. 27-28.)
Mashburn is correct that a defendant may move to withdraw a guilty plea up to 30 days after sentence is pronounced. See Grier v. State, 825 So.2d 873, 874 (Ala.Crim.App.2001) (“A motion to withdraw a guilty plea is the functional equivalent of a motion for a new trial, and must be filed within 30 days after the entry of the judgment or the imposition of sentence.”), and Rule 24.1(b), Ala. R.Crim. P. However, Mashburn failed to allege in his petition when he discussed with his counsel his desire to withdraw his pleas. Mashburn alleged only that he did so “subsequent” to pleading guilty. The fact that Mashburn indicated a desire to withdraw his pleas sometime after he entered them is simply not sufficient to indicate that Mashburn timely made his request to counsel within the 30-day limit for filing a motion to withdraw the pleas. Therefore, Mashburn failed to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), and summary dismissal of this claim of ineffective assistance of counsel was proper.

Penalty-Phase Ineffective-Assistance Claims

In his petition, Mashburn listed 12 mitigating circumstances the trial court found to exist:
“(i) [Mashburn] was relatively young (24) at the time of the crime.
“(ii) [Mashburn] had been raised in a dysfunctional family unit.
“(in) [Mashburn] had been subjected to emotional and physical abuse as a child,
“(iv) [Mashburn] had a history of substance abuse starting from an early age.
“(v) [Mashburn] at an early age told his mother and pastor that he had heard voices.
“(vi) [Mashburn] is not retarded but may not have been able to achieve his maximum educational potential due to a condition similar to Attention Deficit Disorder with, perhaps, some hyperactivity component.
“(vii) That [Mashburn] was not presented to a mental health or medical professional for any of the mental, psychological, or cognitive issues his family stated that he suffered as a child and none was afforded [Mashburn] through the public schools.
“(viii) [Mashburn’s] family, as demonstrated, through a genealogical chart, maternal and paternal, showed generational patterns of substance abuse, mental health and social adjustment issues.
“(ix) Mental health experts opined that [Mashburn] had a decreased intellectual function likely caused by poly-substance abuse and alleged physical trauma, which trauma was not objectively demonstrated.
“(x) [Mashburn] was loved by his family, “(xi) [Mashburn] had no significant history of prior criminal activity.
“(xii) That [Mashburn] suffered a difficult birth and was ‘dark’ (anoxic) at birth resulting in physical brain damage.”
(C. 62-63.) We point out that, although not mentioned by Mashburn in his petition, the trial court also considered as a mitigating circumstance the fact that Mashburn *1132 had accepted responsibility for the crimes by pleading guilty.
We also point out that the trial court found four aggravating circumstances to exist: (1) that the murders were committed during the course of a burglary; (2) that the murders were committed during the course of a robbery; (3) that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses; and (4) that the defendant caused the death of two or more persons pursuant to one scheme or course of conduct.
Additionally, Mashburn alleged in his petition that his trial counsel had called 13 witnesses to testify on his behalf at the penalty phase of the trial, including neu-ropsychologist Dr. Robert Shaffer and neuropsychiatrist Dr. Thomas Sachy. The record from Mashburn’s direct appeal reflects that the penalty phase of the trial lasted five days, beginning on Wednesday, September 20, 2006, and concluding on Tuesday, September 26, 2006, and that trial counsel’s presentation of mitigating evidence encompassed over 700 pages of transcript.
I.
Mashburn contends that the circuit court erred in summarily dismissing on pleading grounds the claim in his petition that his trial counsel were ineffective for not adequately conducting a mitigation investigation. (Issue II.E.1. in Mash-burn’s brief; Part VI.A in Mashburn’s petition.)
With regard to counsel’s duty to investigate, this Court has explained:
“ ‘While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, “this duty only requires a reasonable investigation.” Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 561 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a “substantial investigation into each of the plausible lines of defense.” Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). “A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.” Id., 466 U.S. at 686,104 S.Ct. at 2063.’
“Jones v. State, 753 So.2d 1174, 1191 (Ala.Crim.App.1999).
“ ‘[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’
“Strickland v. Washington, 466 U.S. 668, 690-91 (1984).
“ ‘The reasonableness of the investigation involves “not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.’” St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006) (quot *1133 ing Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). ‘[BJefore we can assess the reasonableness of counsel’s investigatory efforts, we must first determine the nature and extent of the investigation that took place-’ Lewis v. Horn, 581 F.3d 92, 115 (3d Cir.2009). Thus, ‘[although [the] claim is that his trial counsel should have done something more, we [must] first look at what the lawyer did in fact.’ Chandler v. United States, 218 F.3d 1305,1320 (11th Cir.2000).”
Broadnax v. State, 130 So.3d 1232, 1248 (Ala.Crim.App.2013).
“ ‘A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.’” Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir.1993) (quoting United States v. Green, 882 F.2d 999, 1003 (5th Cir.1989)). “[C]laims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result.” Thomas v. State, 766 So.2d 860, 892 (Ala.Crim. App.1998) (citing Nelson, supra), aff'd, 766 So.2d 975 (Ala.2000), overruled on other grounds by Ex parte Taylor, 10 So.3d 1075 (Ala.2005).
In his petition, Mashburn divided this claim into the following subclaims: (1) that his trial counsel delayed beginning their mitigation investigation by not hiring a private investigator or mitigation specialist for two years after they were appointed to represent him; (2) that his trial counsel did not take reasonable steps to verify the credentials and assess the credibility of their private investigators and mitigation specialists, which resulted in further delays in the mitigation investigation when counsel had to fire the first private investigator and the first two mitigation specialists; and (3) that his trial counsel did not adequately supervise the private investigators and mitigation specialists, which resulted in delays in counsel seeking expert assistance and preparing for the penalty phase of the trial.[8] Although Mashburn divided this claim in terms of counsel’s delay, counsel’s hiring practices, and counsel’s supervision, we find it more apt to consider the claim first as it applies to counsel’s private investigators and then as it applies to counsel’s mitigation specialists.

Private Investigators

In his petition, Mashburn alleged that his trial counsel were appointed in May 2003 but did not hire a private investigator for almost two years. Specifically, Mash-burn asserted that it was not until January 25, 2005, one year and eight months after their appointment, that counsel filed a motion for funds to hire an investigator and hired their first investigators, Bob Parker & Associates, a private-investigation firm. The firm, Mashburn alleged, “was a partnership between Captain Bobby Wayne Parker, a retired police officer in Anniston, Alabama, and a man named Robert David Madrid,” whose “curriculum vitae stated that he had received an undergraduate degree from the University of Maryland, a master’s degree from Georgetown University, a medical degree from Harvard, and a PhD from the University of Massachusetts.” (C. 37.) Mashburn alleged, however, that counsel failed to verify the credentials of Madrid before hiring Bob Parker & Associates, and that *1134 counsel learned on February 7, 2005, that Madrid’s credentials were false and that Madrid “had been an assistant pet groomer in Salt Lake City[, Utah,] before he became a private investigator in Anniston, Alabama.” (C. 38.) Mashburn alleged that counsel fired Bob Parker & Associates on February 7, 2005, the day they learned that Madrid’s credentials had been falsified, but that counsel’s “failure to take reasonable steps to verify Dr. Madrid’s credentials resulted in the loss of valuable time to investigate Mr. Mashburn’s case,” including “the time it took [trial counsel] to hire a new private investigator.” (C. 38.)
Mashburn alleged that counsel did not hire another private investigator until over five months later, on July 20, 2005, when they hired Charles F. Edgar & Associates, a private investigation firm “outside Calhoun County, Alabama.” (C. 38-39.) Mashburn alleged that counsel met with Edgar only once, “in May or June 2005,” and “obtained Mr. Edgar’s resume,” but “did not ask Mr. Edgar for any additional information to verify Mr. Edgar’s credentials” or “request that Mr. Edgar provide [counsel] with any references.” (C. 39.) Mashburn also alleged that counsel “did not request the references or credentials of Mr. Edgar’s associate, Michelle Williams, who would be assigned to the case” and that counsel “did not verify Michelle Williams’s professionalism or competence as an investigator.” (C. 39.)
Mashburn also asserted that trial counsel did not properly supervise and direct Williams’s investigation. According to Mashburn:
“Ms. Williams relied heavily on calling witnesses on the telephone to set up appointments and many witnesses simply declined to meet with Ms. Williams. If Ms. Williams had a witness’s address, but not his or her phone number, Ms. Williams would send the witness letters and wait for written replies. When witnesses declined to talk to Ms. Williams, she generally did not persist in her attempts to interview them. These investigative techniques prejudiced the preparation of Mr. Mashburn’s defense.
“[Trial counsel] failed to adequately monitor Ms. Williams’s progress in investigating Mr. Mashburn’s case. They did not take reasonable steps to address the fact that Ms. Williams encountered severe difficulty in getting witnesses to speak with her. This difficulty extended to important witnesses, such as the owner of the pawnshop where the supposedly [stolen] jewelry had been recovered after the crime. [Trial counsel] did not request that Ms. Williams persist in her attempts to contact the witnesses, nor did [trial counsel] hire another investigator who could have greater success interviewing witnesses.
“[Trial counsel’s] failure to monitor Ms. Williams is further evidenced by their failure to discover that she later decided to lay the case aside and hoped that witnesses would speak more freely with her after a few months.
“Once Ms. Williams learned that the State’s DNA evidence implicated Mr. Mashburn, she felt that any additional investigation would be futile and terminated her investigation of the case. [Trial counsel] failed to direct Ms. Williams not to give up on her investigation even if she heard that DNA evidence had implicated Mr. Mashburn and failed to hire another investigator to continue the investigation.”
(C. 42-43.)
As it relates to counsel’s handling of private investigators, this claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Although Mashburn identified the acts or omissions of counsel that he be *1135 lieved constituted deficient performance, he failed to plead any facts indicating that he was prejudiced by counsel’s performance as it relates to private investigators. Mashburn alleged generally that counsel delayed over two years after their appointment before hiring their first private investigator and that counsel’s alleged failure to verify the credentials of the first private investigator they hired resulted in further delay — an approximate five-month additional delay based on Mashburn’s pleadings. However, Mashburn failed to identify within this claim any evidence, information, or witness that could have been, but was not, discovered as a result of the delay.
Mashburn also alleged that counsel did not adequately verify the credentials and professionalism of, or supervise the investigation by, the second private investigator they hired, Michelle Williams, and that, as a result, “Ms. Williams encountered severe difficulty in getting witnesses to speak with her” and “many witnesses simply declined to meet with Ms. Williams.” (C. 42.) However, other than a single reference to “the owner of the pawnshop where the supposed [stolen] jewelry had been recovered after the crime,” Mashburn failed to identify within this claim a single witness to whom Williams was unable to speak, failed to allege what those unidentified witnesses would have said to Williams had she spoken to them, and failed to allege how that information would have been helpful to his mitigation case.[9] With respect to “the owner of pawnshop,” Mash-burn generally identified the witness by occupation, but did not identify the witness by name, failed to allege what the witness would have said to Williams had she spoken to him or her, and failed to allege how that information would have been helpful to his mitigation case.
Finally, Mashburn alleged that Williams stopped her investigation after learning that DNA evidence implicated Mashburn in the crimes and that counsel should have directed Williams to continue the investigation despite the DNA evidence. However, again, Mashburn failed to identify within this claim any evidence, information, or witness that would have been discovered by Williams had she continued her investigation.
For these reasons, Mashburn failed to plead sufficient facts indicating that his counsel were ineffective because of their delay in hiring, their alleged failure to verify the credentials of, and their alleged failure to supervise the investigation by, the private investigators. Therefore, summary dismissal of this claim of ineffective assistance of counsel as it relates to private investigators was proper.

Mitigation Specialists

In his petition, Mashburn alleged that, although counsel were appointed in May 2003, they waited until June 27, 2005, to move for funds to hire their first mitigation specialist — Lucia Penland, an employee of the Alabama Prison Project at the time. According to Mashburn, counsel failed to include with the motion for funds Penland’s resume, and they had to file an amended motion, which resulted in the trial court’s not granting the motion for funds until August 8,2005. Mashburn also alleged that when counsel hired Penland, they believed that the Alabama Prison Project “was a “well funded, well equipped and well staffed professional organiza *1136 tion’ ” but that they “did not take the steps necessary to investigate and monitor the reputation and operations of the Alabama Prison Project.” (C. 39.) As a result, Mashburn asserted, counsel “did not realize until early October 2005” (C. 33) that the Alabama Prison Project had lost its funding and shut down in September 2005 and that Penland, who had “assumed responsibility for the entirety” of the organization’s caseload when it shut down and began “ ‘working from her personal home’ ” (C. 40), had “done no mitigation work for use in Mr. Mashburn’s defense since July 2005.” (C. 33.)
Mashburn alleged that on October 10, 2005, counsel moved for funds to hire their second mitigation specialist, JoAnne Terrell. According to Mashburn, “Terrell refused to begin working on the case until funds were approved,” and the trial court did not grant the request for funds “until November 30, 200[5].” (C. 33.) Mashburn asserted that trial counsel did not take “reasonable measures to evaluate Ms. Terrell’s competence or professionalism before hiring her.” (C. 40.) Mashburn also asserted that although the trial date “was less than three (3) months away, neither [trial counsel] monitored Ms. Terrell’s progress in performing a mitigation investigation for Mr. Mashburn” and, thus, “did not know until mid-January [2006], about a month before trial [was scheduled to begin], that Ms. Terrell had not yet begun working on Mr. Mashburn’s mitigation investigation.” (C. 33.) As a result of their failure to monitor Terrell’s investigation, Mashburn asserted, counsel “were forced to ask the court for a continuance of the trial so that they could have more time to complete a mitigation investigation.” (C. 40.) Mashburn stated in his petition that when the trial court denied the continuance, “Terrell resigned her position.” (C. 40.)
Mashburn alleged that after Terrell resigned, the trial court granted a continuance. In March 2006, Mashburn said, trial counsel “began preliminary correspondence” with Susan Wardell regarding hiring her as their third mitigation specialist. (C. 33.) Mashburn asserted that Wardell indicated “that she usually needed four (4) months to complete a mitigation investigation but that she would rush to complete Mr. Mashburn’s case within three months.” (C. 34.) Mashburn stated that Wardell “began work on Mr. Mashburn’s case in March 2006” (C. 43) but that counsel “did not have a copy of her resume or credentials as of April 25, 2006.” (C. 40.) Mashburn also asserted that counsel “failed to take reasonable steps to verify Ms. Warden’s assertion that she was a Licensed Clinical Social Worker” (C. 40) in the State of Georgia even though, Mash-burn said, “Ms. Wardell’s license could have easUy been verified” at “[t]he website of the Georgia Secretary of State.” (C. 41.) According to Mashburn:
“Before and during trial, Ms. Wardell was not a Licensed Clinical Social Worker. Indeed, at trial, the fact that Ms. WardeU was not a Licensed Clinical Social Worker was used to impeach her testimony. In an attempt to rehabilitate her credibility as an expert, [trial counsel] had to have Ms. Wardell explain that, while she said she was a licensed clinical social worker, she had actually only taken the exam and beUeved she would pass.
“In addition to making Ms. WardeU explain that she was not a Licensed Clinical Social Worker, the prosecution also impeached Dr. Shaffer’s testimony by asking him whether he believed she was a Licensed Clinical Social Worker when he worked with her.”
(C. 41.)
Mashburn asserted that in April 2006 the trial court scheduled the trial for Sep *1137 tember 11, 2006, which, based on Mash-burn’s own assertions that Wardell began working in March 2006, gave Wardell six months to conduct a mitigation investigation, two months more than she had indicated she needed. Nonetheless, Mashburn alleged in his petition that “Ms. Wardell had little time to complete a comprehensive mitigation investigation” because, Mashburn said, “neither [trial counsel] ensured that either Ms. Wardell or any other expert was spending enough time on Mr. Mashburn’s mitigation investigation” and there is no “evidence that [trial counsel] made any effort of their own to assist in the mitigation investigation.” (C. 34.) Specifically, Mashburn asserted that War-dell “performed only preliminary work on Mr. Mashburn’s behalf’ in March and April 2006 (C. 84); that counsel “did not take reasonable steps to ensure that significant mitigation investigation was done in May or July of 2006” (C. 34); that “War-dell did not perform any mitigation investigation during the month of July 2006” (C. 43); that “the majority of Ms. Wardell’s mitigation efforts occurred in June and August 2006” (C. 34); and that counsel “did not take steps to ensure that Ms. Wardell completed her investigation of Mr. Mashburn’s defense in a timely manner.” (C. 35.) As a result, Mashburn alleged, he “received a rushed and incomplete mitigation defense.” (C. 35.) He also argued:
“Ms. Wardell continued interviewing mitigation witnesses and gathering information while the trial was in progress. In fact, on at least one (1) occasion, Ms. Wardell interviewed a witness and decided to have him testify the next day.
“In another instance of rushed investigation, [trial counsel] met, interviewed, and decided while the trial was in progress to have another witness testify. The witness was a credible and independent witness, but was subject to impeachment because she was nervous and unprepared to testify.”
(C. 35.)
Mashburn further alleged that trial counsel “delegated the strategic task of hiring and coordinating evaluations by forensic and psychiatric experts to Ms. War-dell” and that counsel did not supervise “Ms. Wardell’s assignments to ensure that they were timely, organized, or based on the professional credentials of the experts themselves.” (C. 44.) As a result, Mash-burn asserted, counsel “did not coordinate a psychiatric or neurological examination of Mr. Mashburn until one month before trial” (C. 30) and “[consequently, the evaluations of Mr. Mashburn by Dr. Shaffer and Dr. Sachy were rushed.” (C. 34.) Specifically, Mashburn asserted:
“[Trial counsel] did not arrange for Mr. Mashburn to receive a psychological examination until late July 2006. Dr. Shaffer, the neuropsychologist hired to evaluate Mr. Mashburn, did not review Mr. Mashburn’s records until July 28, 2006. Dr. Shaffer did not evaluate Mr. Mashburn in any psychological capacity until August 9, 2006. Dr. Shaffer thus based his evaluation of Mr. Mashburn on a little more than a month of review and only a few hours of person-to-person evaluation.
“[Trial counsel] did not arrange for Mr. Mashburn to receive a neuropsy-chiatric examination until mid-August 2006, just weeks before trial. Dr. Sachy, the neuropsychiatrist hired to evaluate Mr, Mashburn’s brain damage and mental state, was not hired until at least August 14, 2006. In a communication of August 14, 2006, Dr. Sachy stated that he would not be able to work on Mr. Mashburn’s case for at least two weeks. He then stated that he would need a few weeks to compile a report *1138 based on this evaluation. At this point, trial was less than one (1) month away.
“An MRI of Mr. Mashburn’s brain was not approved until August 15, 2006. Dr. Sachy did not examine Ellis Mash-burn until August 27, 2006. Dr. Sachy was then required to [perform] a complete examination of Mr. Mashburn and prepare to testify on his behalf by September 25, 2006.
“Because Dr. Sachy and Dr. Shaffer were not hired until six (6) weeks before trial, their examination of Mr. Mashburn was incomplete, uncoordinated, and rushed. As a result, both Dr. Sachy and Dr. Shaffer lost credibility during trial.”
(C. 44-45; footnotes omitted.) Mashburn further asserted that counsel “did not get involved in decisions of strategy or medical testing during Mr. Mashburn’s mitigation investigation,” but that “Ms. Wardell was responsible for deciding what psychological exams Mr. Mashburn would take in conjunction with the doctors.” (C. 45.)
Finally, Mashburn asserted that counsel “did not take reasonable steps to ensure that Ms. Wardell was producing accurate documents regarding Mr. Mashburn’s life” (C. 35) and “did not take reasonable steps to find and evaluate Mr. Mashburn’s pediatric records, as discussed more fully above.” (C. 36.)[10] As a result, Mashburn said, “Dr. Shaffer and Dr. Sachy relied on a social history that stated incorrectly that Mr. Mashburn was anoxic at birth which was used to impeach their diagnoses of Mr. Mashburn.” (C. 36.) According to Mashburn, “[h]ad [trial counsel] protected their expert witnesses from unnecessary impeachment [by obtaining Mashburn’s pediatric medical records], there is a reasonable possibility the expert witnesses would have been credible and Mr. Mash-burn would have received a life sentence” and he was thus “significantly prejudiced.” (C. 36.) We note that Mashburn also asserted within this claim that counsel’s “complete failure to perform an independent investigation was wholly unreasonable.” (C. 31.)
Although at first blush Mashburn’s lengthy recitation within this claim in his petition of the time line of events regarding counsel’s hiring and firing of various mitigation specialists may appear to be sufficiently pleaded, it is not. Mashburn did specifically identify the acts or omissions of counsel he believed constituted deficient performance — counsel’s two-year delay in hiring a mitigation specialists, counsel’s alleged failure to verify the credentials of the three mitigation specialists they hired, and counsel’s alleged failure to supervise the mitigation investigation or conduct their own independent mitigation investigation. However, Mashburn failed to allege sufficiently specific facts indicating that he was prejudiced by counsel’s performance.
Mashburn made bare assertions that the mitigation investigation was “rushed and incomplete” but, with the exception of his pediatric medical records (which we discuss below), Mashburn failed to identify within this claim in his petition any information or any evidence that could have been, but was not, discovered as a result of the allegedly “rushed” investigation. He also failed to identify within this claim in his petition any witnesses who were not discovered as a result of the allegedly “rushed” investigation and who could have testified on his behalf during the penalty phase of the proceedings.
Mashburn also asserted in his petition that counsel failed to verify the credentials of his third mitigation specialist, Wardell, and that, as a result, both Wardell and Dr. Shaffer and Dr. Sachy were impeached by the fact that Wardell was not a licensed *1139 clinical social worker. However, making only a bare allegation that witnesses were impeached and that, absent the impeachment, there was a reasonable probability that the outcome of the trial would have been different is not sufficient to indicate prejudice. Mashburn alleged no facts within this claim in his petition indicating that if Wardell and Dr. Shaffer and Dr. Sachy had not been impeached in this manner, there is a reasonable probability that the outcome of the proceedings would have been different, i.e., that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
Mashburn asserted that the allegedly “rushed” investigation resulted in two witnesses being interviewed during the trial and then called to testify at the last minute. However, Mashburn failed to identify the witnesses who were allegedly called to testify at the last minute and failed to state within this claim what those witnesses’ testimony was. Additionally, Mashburn asserted that one of those witnesses “was subject to impeachment because she was nervous and unprepared to testify” (C. 35), but he failed to allege specifically how the witness was impeached or how that impeachment affected the witness’s testimony. Likewise, Mashburn failed to allege any facts indicating that had these two witnesses not been called to testify at the last minute, there is a reasonable probability that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
Mashburn also alleged that counsel’s allegedly deficient mitigation investigation resulted in counsel’s not having Mashburn evaluated until the month before trial, and he listed in his petition several dates relating to Mashburn’s evaluations by Dr. Shaffer and Dr. Sachy. However, Mashburn made only a bare and conclusory allegation that as a result of the delay the evaluations by Dr. Shaffer and Dr. Sachy were “incomplete, uncoordinated, and rushed.” (C. 45.) Mashburn alleged no facts -within this claim in his petition regarding what evaluations were conducted by Dr. Shaffer and Dr. Sachy, what specifically they testified to at trial, what part of the evaluations were “incomplete,” or, most importantly, what Dr. Shaffer and Dr. Sachy would have testified to had they had additional time in which to evaluate Mashburn.
Mashburn also alleged that counsel’s allegedly deficient mitigation investigation resulted in his counsel’s failing to obtain his pediatric medical records, that those records were used to impeach Dr. Shaffer and Dr. Sachy, and that had counsel obtained the records “there is a reasonable possibility the expert witnesses would have been credible and Mr. Mashburn would have received a life sentence.” (C. 36.) However, contrary to Mashburn’s apparent belief, merely asserting that his expert witnesses would have been “credible” and that he would have “received a life sentence” is not sufficiently specific to satisfy the pleading requirements for the prejudice prong of the Strickland test. Such a statement is a conclusion, not an assertion of fact. Mashburn alleged no facts within this claim in his petition indicating that if Dr. Shaffer and Dr. Sachy had not been impeached in this particular manner, there is a reasonable probability that the sen-tencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Therefore, Mashburn failed to plead sufficient facts indicating that he was prejudiced by counsel’s failure to obtain his pediatric medical records.
Finally, as noted above, Mashburn alleged in his petition that his counsel’s “complete failure to perform an independent investigation was wholly unreason *1140 able.” (C. 31.) To the extent that this claim of ineffective assistance of counsel is premised on counsel’s hiring other people to conduct the mitigation investigation instead of conducting the investigation themselves, this Court has rejected such a claim:
“‘The appellant appears to argue that counsel could not delegate the responsibility to investigate to a subordinate. We disagree.
“ ‘[I]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989). In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pretrial investigation. See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir.1991).’
“Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998). See also Callahan v. State, 24 S.W.3d 483, 486 (Tex.Ct.App.2000) (holding that ‘[a] defense attorney is not required to investigate the facts of a case personally. Counsel may delegate the investigation to a private investigator’). Finally, when discussing the duty to investigate mitigating evidence in Rompilla[ v. Beard, 545 U.S. 374 (2005) ], Wiggins[ v. Smith, 539 U.S. 510 (2003) ], and Williams[ v. Taylor, 529 U.S. 362 (2000) ], the Supreme Court did not expressly or impliedly hold that counsel must perform the actual investigation. Therefore, we conclude that the appellant’s trial attorneys did not render ineffective assistance when they relied on subordinates to conduct most of the mitigation investigation, communicated with them during the investigation, and made the ultimate decision about what mitigation evidence to present.”
Hall v. State, 979 So.2d 125,163 (Ala.Crim.App.2007).
For these reasons, we conclude that Mashburn failed to plead sufficient facts indicating that his counsel were ineffective because of their delay in hiring, their alleged failure to verify the credentials of, and their alleged failure to supervise the investigation by, the mitigation specialists. Therefore, summary dismissal of this claim of ineffective assistance of counsel as it relates to mitigation specialists was proper.
J.
Mashburn also contends that the circuit court erred in summarily dismissing on pleading grounds the claim in his petition that his counsel were ineffective for not adequately advocating that Mashburn stop receiving the medication he was taking before his trial. (Parts VI.A.iv. and VI.B.iv. in Mashburn’s petition; C. 46.)
In his petition, Mashburn alleged:
“On August 23, 2006, less than one (1) month before trial, Dr. Shaffer sent an email to [trial counsel] asking that Mr. Mashburn be removed from his current course of prescription medication. Pursuant to that request, on August 25, 2006, [the trial court] heard arguments related to whether or not Mr. Mashburn should stop taking certain psychotropic drugs.
“At the time, Mr. Mashburn was receiving a course of prescription psychotropic drugs. Mr. Mashburn was prescribed eighty (80) milligrams of Elavil twice a day, ten (10) milligrams of Valium twice a day, and eighty (80) milligrams of Inderol once a day.
“In his email to [trial counsel], Dr. Shaffer asked that Mr. Mashburn be gradually removed from these psychotropic drugs so that Dr. Shaffer could perform a complete psychiatric and psy *1141 chological evaluation of Mr. Mashburn. ‘It is advisable for Mr. Mashburn to be relatively free from his psychoactive medications for the completion of the neurological testing,’ wrote Dr. Shaffer. ‘A review of [Mr. Mashburn’s] medications reveals that he is taking some psychoactive medications for which a ■physician may want to prescribe a tapering dosage rather than elimination of the medication altogether.’
“The prosecution argued that a tapering of Mr. Mashburn’s medications would delay the trial. ‘We’re just concerned about the trial itself and the beginning of the trial,’ [the prosecutor] said. [The trial court] agreed. ‘This case has been continued for the defense previously. The train has essentially pulled out of the station. All jurors have been summoned.’
“[The trial court] then gave Mr. Mashburn a choice: give up the drugs immediately and without weaning or continue to take the drugs through his trial. Before presenting Mr. Mashburn with that choice, [the trial court] specifically asked [trial counsel] if he had any objections.
“At the time, [trial counsel] was aware that his client had a long history of polysubstance abuse. [Trial counsel] also understood that his client had a severe dependence on medications. Despite knowing this, he did not object to [the trial court] presenting Mr. Mash-burn with the stark choice between harsh withdrawal and continued drug use.
“A drug-addicted Mr. Mashburn answered that he would rather continue to take the drugs than to suffer the severe effects of withdrawal right before trial. ‘It’s bad DTs [delirium tremens], the Elavil more than the Valium,’ he explained.
“Mr. Mashburn was continued on his course of treatment, and Dr. Shaffer could not perform a complete evaluation of Mr. Mashbum’s psychological condition.
“On September 4, 2006, the defense was made aware that the course of treatment given to Mr. Mashburn was not beneficial to him and could cause various harmful side effects in Mr. Mashburn. In a report, Dr. Sachy wrote that Mr. Mashburn’s current course of treatment was ineffective and would exacerbate Mr. Mashburn’s bipolar disorder. The discontinuous administration of Valium to Mr. Mashburn would result in ‘mood instability,’ ‘rebound irritability,’ and ‘initial behavioral disinhibition.’ Moreover, Elavil could cause a ‘worsening of the mania in those predisposed to Bipolar Disorder.’ However, with more current generation mood stabilizers, Mr. Mashburn would be far better stabilized.
“Mr. Mashburn’s prison records indicate that his Valium prescription was administered discontinuously. In the month of April 2006, Ellis Mashburn received his dosages of Valium only seven (7) times.
“[Trial counsel] made no attempt to wean his client off his ill-advised and dangerous course of psychotropic medication.
“[Trial counsel] did not arrange for a psychiatric examination of Mr. Mash-burn before August 2006, and Mr. Mash-burn could not be weaned off his drugs before trial began. [The trial court] followed similar logic on August 25, 2006 when [it] stated, ‘This man has been in custody three or four years. Where have they been all this time? Okay? I continued the case once. And I know we were waiting on autopsy results, DNA, all the things that forensic sciences have to back up, but there’s not a thing has stopped us from moving forward on the use of experts to evaluate *1142 him. He could have been tested a thousand times between the date of arrest and today, and they are going to have to learn that the judicial process marches to an established beat, not the beat of their own drum.’
“When asked if he wanted to object, [trial counsel] did not record any objection to [the trial court] presenting Mr. Mashburn, a chronic drug addict since the age of eleven (11), with the choice between severe withdrawal symptoms and a full presentation of his mitigation defense.
“[Trial counsel] did not pursue any argument that weaning Mr. Mashburn off his drugs was necessary to the full presentation of Mr. Mashburn’s defense.
“Mr. Mashburn was not weaned off his course of psychotropic drugs before or during his trial. Dr. Shaffer could not perform a full and extensive psychological evaluation of Mr. Mashburn as he had intended.”
(C. 46-49; footnotes omitted.) Mashburn also alleged:
“As previously set forth, [trial counsel] did not pursue any argument that weaning Mr. Mashburn off his drugs was necessary to the full presentation of Mr. Mashburn’s defense.
“Despite being told of the problem, [trial counsel] did not take steps to remedy the fact that his client was suffering from a misdirected course of treatment that affected the client’s demeanor, mood and reasoning during trial.
“Mr. Mashburn was not weaned off his course of psychotropic drugs before or during his trial. Dr. Shaffer could not perform a full and extensive psychological evaluation of Mr. Mashburn as he had intended. Throughout his trial, Mr. Mashburn suffered from a panoply of symptoms that undercut his ability to aid in his defense and prevented Mr. Mashburn from expressing his remorse or contrition to the jury.”
(C. 59; footnotes omitted.)
In its order, the circuit court addressed this claim as follows:
“In paragraphs 155 through 169, Mashburn raises claims of ineffective assistance of counsel regarding Dr. [Shaffer]’s request that Mashburn be weaned off of his prescribed medications prior to diagnostic testing that Dr. Sachy planned to perform....
“... This claim is insufficiently pleaded. Mashburn appears to be suggesting that trial counsel should have made some objection when [the trial court] asked him whether he wanted to be taken off of his medication. However, he does not identify what objection could have been made or what grounds there were to support an objection. Nor does he specifically identify any testing that could not be performed due to the presence of prescribed medication in Mashburn’s system. Nor does he allege specific facts to show how he was prejudiced by trial counsel’s alleged failures .... Consequently, this claim is summarily dismissed, Ala. R.Crim. P., 32.3, 32.6(b), 32.7(d).
[[Image here]]
“In paragraphs 208 through 209, Mashburn references claim V(A)(iv) in which he contended that trial counsel were ineffective for failing to advocate that he be weaned off of his prescribed medications. For the reasons given in Section XVI above, that claim is summarily dismissed. Mashburn further claims that trial counsel’s failure to ensure that his prescription medications were cut off caused him to ‘suffer[ ] from a panoply of symptoms that undercut his ability to aid in his defense.’ The Court finds that this claim is insufficiently pleaded. Mashburn fails to identify any *1143 specific impairment caused by his prescribed medications. Further, Mash-burn fails to plead sufficient facts to explain how the trial court’s decision not to cease administration of his prescribed medications actually prejudiced him.... Consequently, this claim is summarily dismissed. Ala. R.Crim. P., 32.3, 32.6(b), 32.7(d).”
(C. 212-22; citations omitted.) We agree with the circuit court.
Mashburn failed to plead sufficient facts in support of this claim to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Although Mashburn alleged that his counsel did not object when the trial court gave Mashburn the choice of continuing with his medication or stopping the medication all at once instead of tapering off the medication, he failed to allege in his petition what objection he believed counsel should have made that would have resulted in the trial court changing its ruling, postponing the trial, and allowing Mashburn to be weaned off of his medications over time. Cf., Daniel v. State, 86 So.3d 405, 423 (Ala.Crim.App.2011) (holding that Rule 32 petitioner failed to satisfy pleading requirements regarding claim that counsel was ineffective for not objecting to admission of shoe prints where petitioner failed to plead “what objection counsel could have made that would have resulted in the shoe prints being excluded”).
Likewise, Mashburn alleged that “Dr. Shaffer could not perform a full and extensive psychological evaluation of Mr. Mash-burn as he had intended” because of Mr. Mashburn’s medication. (C. 49.) However, Mashburn failed to allege exactly what part of the evaluation Dr. Shaffer could not perform or what the results of that part of the evaluation would have been had Mashburn been taken off his medication.
Mashburn also alleged that Dr. Sachy opined that Mashburn’s medications were ineffective and would worsen Mashburn’s bipolar disorder, and that the “discontinuous administration of Valium to Mr. Mash-burn would result in ‘mood instability,’ ‘rebound irritability,’ and ‘initial behavioral disinhibition.’” (C. 48.) However, Mash-burn did not specifically allege that he suffered from mood instability, rebound irritability, or initial behavioral disinhibition. Rather, he made only the bare allegation that he “suffered from a panoply of symptoms that undercut his ability to aid in his defense and prevented [him] from expressing his remorse or contrition to the jury” without specifically identifying those symptoms. (C. 59.)
For these reasons, Mashburn failed to plead sufficient facts to indicate that his counsel were ineffective for not adequately advocating that he be weaned off his medications before trial, and summary dismissal of this claim of ineffective assistance of counsel was proper.
K.
Mashburn next contends that the circuit court erred in summarily dismissing on pleading grounds the claim in his petition that his trial counsel were ineffective for not adequately presenting mitigation evidence. (Issue II.E.2. in Mashburn’s brief; Part VLB. in Mashburn’s petition.) In his petition, Mashburn divided this claim into multiple subclaims, each of which we address in turn.[11]
1.
Mashburn alleged in his petition that his counsel “failed to make reasonable efforts to learn, understand, or present at trial much of the mitigating evidence col *1144 lected by Susan Wardell.” (Part VI.B.i. in Mashburn’s petition; C. 50.) He asserted:
“As previously established, [trial counsel] failed to monitor or supervise Susan Warden’s mitigation investigation of Mr. Mashburn. Additionally, neither [trial counsel] took the time to study Ms. War-dell’s findings or notes before trial. Indeed, on July 30, 2006, one month and eleven days before trial began, [trial counsel] acknowledged that [they] did not have a complete understanding of the mitigation presentation, notwithstanding the fact that at this time Mr. Mashburn and trial counsel had made the decision to plead guilty to capital murder, thereby relying entirely on the mitigation phase at trial.
“During trial, [the trial judge] ordered that Ms. Wardell could not sit with counsel during Mr. Mashburn’s sentencing phase, as she was also scheduled as a witness. Ms. Wardell therefore could not assist the defense in their examination of pivotal mitigation witnesses. Neither [trial counsel] objected to this ruling, nor did they consider the ramifications of not having Ms. Wardell present during the mitigation presentation.
“Because [trial counsel] failed to study or discover what mitigating evidence Ms. Wardell had collected during her investigation, [trial counsel] did not present material portions of that evidence during Mr. Mashburn’s trial. Moreover, because neither [trial counsel] reviewed Ms. Wardell’s notes, they did not understand vital information which Ms. Wardell had not told them or had decided was irrelevant, including the defendant’s state of mind at the time of the crime.
“[Trial counsel] did not coordinate their defense of Mr. Mashburn. Mr. Mashburn’s private investigators did not meet or know Mr. Mashburn’s mitigation specialists.
“As a result of their failure to become involved with the investigation of the mitigation experts, [trial counsel] failed to affirmatively conduct a reasonable investigation of mitigating evidence which would have aided them in their presentation during the [penalty] phase.... Because [trial counsel] were uninformed about the mitigating factors that existed in Mr. Mashburn’s case, they provided an inadequate and limited presentation of the mitigating evidence. As a result, Mr. Mashburn was prejudiced because this evidence, which most certainly would have been considered by a jury in determining sentencing, was not even presented to the jury. Had [trial counsel] been adequately involved in the mitigation case, they would have properly presented the evidence, and there is a reasonable probability that Mr. Mash-burn would not have received the death penalty.”
(C. 50-52; citations omitted.) This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.8 and Rule 32.6(b).
With respect to Mashburn’s claim that his trial counsel were ineffective for not objecting when the trial court ruled that their mitigation specialist, Susan Wardell, could not remain in the courtroom during the trial, Mashburn failed to allege what objection he believed counsel should have made that would had resulted in the trial court’s allowing Wardell to observe the trial. Cf., Daniel v. State, 86 So.3d 405, 423 (Ala.Crim.App.2011) (holding that Rule 32 petitioner failed to satisfy pleading requirements regarding claim that counsel was ineffective for not objecting to admission of shoe prints where petitioner failed to plead “what objection counsel could have made that would have resulted in the shoe prints being excluded”). Rule 9.3(a), Ala. R.Crim. P., provides:
*1145 “Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the ease, concerning any testimony until all witnesses have been released by the court.”
Similarly, Rule 615, Ala. R. Evid., provides:
“At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.”
Mashburn failed to allege any facts within this claim in his petition indicating that Wardell’s presence was “essential to the presentation of’ his mitigation case. Rather, Mashburn made only a bare allegation that the trial court’s ruling prevented Wardell from assisting the defense in its questioning of “pivotal mitigation witnesses,” which witnesses Mashburn did not even identify in his petition. Therefore, Mashburn failed to plead sufficient facts indicating that his counsel were ineffective in this regard.
With respect to Mashburn’s claim that counsel failed to “study” and to present mitigating evidence discovered by Wardell, Mashburn failed to allege specifically what that mitigating evidence was. Mashburn alleged generally that trial counsel “did not present material portions” of the evidence Wardell had collected, but he failed to identify within this claim what “material portions” of Warden’s evidence his counsel did not present. Indeed, he identified only one piece of evidence Wardell collected that, he said, was not presented to the jury at the penalty phase of his trial — his “state of mind at the time of the crime.” However, he failed to allege in his petition what his state of mind was at the time of the crime or how his state of mind at the time of the crime would have been mitigating.
Therefore, Mashburn failed to plead sufficient facts to indicate that counsel were ineffective in this regard, and summary dismissal of this claim of ineffective assistance of counsel was proper.
2.
Mashburn also alleged in his petition that his trial counsel “failed to present a coherent theory of mitigation at sentencing.” (Part VI.B.ii. in Mashburn’s petition; C. 52.)
In his petition, Mashburn alleged:
“[Trial counsel] revealed that Mr. Mashburn began abusing substances at age eleven (11) and that this substance abuse escalated in volume and intensity over time. [Trial counsel] revealed that Mr. Mashburn’s drug abuse included huffing paint and gasoline, cocaine, acid, marijuana, ecstasy and prescription pills. [Trial counsel] revealed that Mr. Mash-burn’s drug abuse significantly impaired his physical and mental functioning and on one occasion caused him to lose consciousness. [Trial counsel’s] only explanation for Mr. Mashburn’s extreme drug use was that Mr. Mashburn was trying to feel normal and escape reality.
“[Trial counsel] never explained that Mr. Mashburn turned to substance abuse to combat his psychiatric and emotional disabilities. When he was eight (8) years old, Mr. Mashburn’s *1146 caretakers medicated his hyperactivity with Robitussin. At age eleven (11), Mr. Mashburn began medicating his chronic migraines, compulsive behaviors, and the voices he was hearing by huffing paint and gasoline. When huffing became too dangerous, Mr. Mashburn started using marijuana. At age sixteen (16), Mr. Mashburn was introduced to harder drugs by his twenty-six (26) year old brother who had just been released from jail. Mr. Mashburn’s drug use graduated to methamphetamines and then psychotropic prescription pills at age eighteen (18). He used the psychotropic prescription pills to deal with his chronic psychiatric issues.
“[Trial counsel] also never explained at trial the severe neurological or psychological effects of childhood drug abuse on Mr. Mashburn, and did not explain that Mr. Mashburn was under the influence of hallucinogenic and other drugs when the crime was committed.
“[Trial counsel] presented testimony that Mr. Mashburn used to have bad headaches when he was eleven (11) years old. [Trial counsel] never mentioned this fact again nor did he offer any explanation of its significance.
“[Trial counsel] never explained that Mr. Mashburn’s headaches were an indicator of his brain trauma and his psychiatric disorders. [Trial counsel] never explained that Mr. Mashburn’s headaches were one of the causes of his substance abuse, because it was only through substance abuse that Mr. Mash-burn’s symptoms were alleviated. [Trial counsel] also failed to mention that the drugs used partially to treat Mr. Mash-burn’s migraines were the reason he was drugged and without affect during trial.
“[Trial counsel] elicited testimony that Mr. Mashburn spent a lot of time alone as a child and had many imaginary friends. [Trial counsel] never mentioned this fact again nor did he offer any explanation of its significance.
“[Trial counsel] never connected the fact that Mr. Mashburn had many imaginary friends with Mr. Mashburn’s hearing voices or his other psychiatric issues. [Trial counsel] never underscored that Mr. Mashburn’s plethora of imaginary friends was also a consequence of the deep isolation and loneliness Mr. Mash-burn felt as a child. As a child, Mr. Mashburn was ignored by his mother and father, and would wander the woods alone for hours at a time. Mr. Mash-burn was desperate for any maternal attention.
“On direct examination of multiple defense witnesses, [trial counsel] revealed that Mr. Mashburn, as well as all three of his half-siblings, received severe whippings from his father that left bruises, cuts and welts on the children. Through testimony, [trial counsel] also revealed that Mr. Mashburn’s siblings refused to dress for gym class in an effort to hide their injuries. Mrs. Mash-burn never intervened in the whippings and usually left the house when they occurred. [Trial counsel] mentioned this fact in his closing argument and termed it child abuse, but did not explain its significance and impact on Mr. Mash-burn’s life.
“[Trial counsel] never revealed the true depth of Mr. Mashburn’s physical and even emotional abuse at the hands of his father. They failed to explain that victims of child abuse are more likely to engage in substance abuse; are known to suffer chronic headaches, as Mr. Mashburn did; are prone to self-destructive behavior; and are unable to control their anger. [Trial counsel] never explained that child abuse is also linked to other psychiatric disorders and mental illnesses.
*1147 “[Trial counsel] presented testimony that Mr. Mashburn heard voices when he was eight years old but never received treatment for them. In his closing argument, [trial counsel] stated that it was not normal for eight (8) year olds to hear voices. However, [trial counsel] did not provide an explanation of the significance of the fact that Mr. Mash-burn heard voices. They provided no explanation of what can cause a person to hear voices, and they also provided no explanation of the effects that hearing voices as a young child had on Mr. Mashburn’s life.
“[Trial counsel] never presented any psychiatric diagnosis that would explain Mr. Mashburn’s hearing voices. In fact, [trial counsel] failed to introduce evidence that Mr. Mashburn had been hearing voices throughout his life, and not just at a young age. [Trial counsel] failed to introduce that Mr. Mashburn also suffers from compulsive behaviors, will fixate on perceived wrongs, and suffers from chronic migraines.
“[Trial counsel] elicited testimony that mental illness, learning disabilities, substance abuse, and anger management problems run in Mr. Mashburn’s family. [Trial counsel] mentioned this fact in his closing argument but provided no explanation of its significance and impact on Mr. Mashburn’s life.
“[Trial counsel] did not reveal the many symptoms of mental disorder Mr. Mashburn has suffered from for his entire life, including chronic migraines; compulsive behaviors; fixation on perceived slights; rage and anger issues; self-destructive behavior, from fighting to self-mutilation (hair-pulling) in childhood; substance abuse; and others. [Trial counsel] also did not link Mr. Mashburn’s disorders with the disorders his relatives suffer from, which include signs of paranoia, violent behavior, anger issues, and self-destructive behavior.
[Trial counsel] did not present any science that persons with a family history of mental disorder are far more inclined to suffer a psychiatric disorder.
“[Trial counsel] did not reveal that Mr. Mashburn has the capacity for love and self-sacrifice. Mr. Mashburn was a kind and caring uncle to his brother Dewayne’s son. Mr. Mashburn was protective of his cousin, Crystal Duke. Mr. Mashburn loves his mother, and works to reassure her that she was a good mother to him. As a child, Mr. Mash-burn would comfort his nephews when all three were forced to witness Laraine Poore, the defendant’s sister, being abused by her second husband.
“[Trial counsel] presented testimony that Mr. Mashburn dated Sarah Jamie Cuneo for two years and that Ms. Cuneo had psychiatric problems. He present ed testimony that Mr. Mashburn’s drug use increased and intensified when he started dating Ms. Cuneo. [Trial counsel] never mentioned this fact again nor did he offer any explanation of its relevance.
“[Trial counsel] did not reveal that Mr. Mashburn’s life took a severe downward trajectory once he began dating Ms. Cuneo. Ms. Cuneo suffered from severe psychiatric disorders and had access to a range of psychotropic medications. To help Mr. Mashburn deal with his psychiatric disorders, Ms. Cu-neo would offer him her prescription pills. Mr. Mashburn, desperate for self-medication, would take the drugs to alleviate the symptoms of his psychiatric disorders.
“[Trial counsel] did not argue that Mr. Mashburn would have had the capacity for a productive life had he not been born with mental illnesses, had he not been neglected and abused as a child, had he not turned to substance abuse to *1148 escape his psychiatric and emotional disorders, and had he not suffered from multiple head injuries.
“On direct examination of Jeffrey Blackstock, [trial counsel] revealed that Mr. Mashburn was well behaved in jail. [Trial counsel] never mentioned this fact again and did not present it as a mitigating circumstance pursuant to Skipper v. South Carolina, 476 U.S. 1 (1986).
“[Trial counsel] did not present evidence that Mr. Mashburn was capable of reform.
“[Trial counsel] elicited testimony that Mr. Mashburn suffers from bipolar disorder. [Trial counsel] did not present any explanation of what bipolar disorder is, its causes, its symptoms, or its possible effects.
“On direct examination of Dr. Thomas Sachy, [trial counsel] revealed that frontal lobe damage can predispose an individual to aggressive and impulsive behavior. [Trial counsel] presented disputed MRI evidence that Mr. Mashburn suffers from frontal lobe damage. However, [trial counsel] did not provide Dr. Sachy with an overhead projector so that Dr. Sachy could present his own slides demonstrating Mr. Mashburn’s brain trauma. At trial, when the prosecutor refused to loan his projector to the defense, Dr. Sachy was unable to present his evidence of Mr. Mashburn’s brain trauma.”
(C. 52-57.)
Mashburn listed in this claim a plethora of evidence that, he said, was presented at the penalty phase of the trial by his counsel. He then alleged that the significance and/or relevance of this evidence was “never explained,” or that it was “never mentioned” again after it was offered, or that his counsel “did not link” the evidence together. However, a laundry list of evidence presented and bare conclusions that the evidence was, in effect, not properly presented or argued is not sufficient to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b). As the circuit court explained in its order:
“These paragraphs simply present a critique of trial counsel’s mitigation strategy and do not allege sufficient facts to show that trial counsel’s strategy was unreasonable. ‘[B]ecause counsel’s conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that he counsel did take.’ Chandler [v. United States, 218 F.3d 1305,] 1315 [ (11th Cir.2000).]”
(C. 217.) Indeed, it is not even clear from Mashburn’s allegations within this claim whether Mashburn is alleging that counsel was deficient in the manner and order in which they presented the evidence, or that counsel was deficient during closing arguments.
At other points in this claim, Mashburn alleged that counsel failed to present certain mitigating evidence at the penalty phase of his trial. However, nowhere within this claim did Mashburn identify a single witness who would have, or even could have, testified to this allegedly additional mitigating evidence. See, e.g., Yeomans v. State, [Ms. CR-10-0095, March 29, 2013] — So.3d-,-(Ala.Crim.App.2013) (holding postconviction claim that trial counsel was ineffective for not procuring expert testimony to be insufficiently pleaded where petitioner “did not identify, by name, any expert who could have presented that specific testimony”); and Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d-,-(Ala.Crim.App.2010) (holding postconviction claim that trial counsel was ineffective for not adequately investigating and presenting certain evidence to be insufficiently *1149 pleaded where petitioner did “not identify any witnesses who could testify to the facts he claims would have benefitted him”), rev’d on other grounds, [Ms. 1091275, March 18, 2011] — So.3d(Ala.2011).
Finally, we point out that at no point in this claim did Mashburn ever allege that he was prejudiced by counsel’s performance, much less allege specific facts indicating how he was prejudiced, i.e., facts indicating that there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
For these reasons, Mashburn failed to plead sufficient facts indicating that his trial counsel were ineffective in for allegedly not presenting a “coherent” theory of mitigation, and summary dismissal of this claim of ineffective assistance of counsel was proper.
3.
Mashburn also alleged in his petition that his trial counsel “truncated their mitigation presentation to accommodate a juror who had to attend her granddaughter’s funeral after the alternate jurors had been dismissed, and failed to place on the record the fact that their mitigation had been truncated.” (Part VLB.iii. in Mash-burn’s petition; C. 57.) Mashburn asserted:
“On Monday, September 18, 2006, [the trial judge] dismissed the two alternate jurors prior to the jury beginning deliberations in the guilt phase of Mr. Mash-burn’s trial. The penalty phase of Mr, Mashburn’s case began two days later, on Wednesday, September 20, 2006.
“On Friday, September 22, 2006, Juror [B.C.’s] granddaughter was killed in a drunk driving accident. Then, on Monday, September 25, 2006, [the trial judge] told Juror [B.C.]: ‘Ms. [B.C.], very sorry about the loss in your family.
We will work around your needs as best we can. If you will just keep us advised through the bailiff, I will appreciate that.’
“[Trial counsel] were not sufficiently knowledgeable or informed about the expected testimony of the mitigation witnesses to make any considered judgment about what testimony could or should be cut if cuts were required. They delegated substantial responsibility for this decision to Ms. Wardell.
“Standing in the corridor outside the courtroom, Ms. Wardell advised the attorneys on which mitigation witnesses they should cut. The list of mitigation witnesses was then cut from more than 40 to 13. Ms. Wardell was not capable of making the judgments that a competent capital defense lawyer would have had to make under these circumstances if, after recording appropriate objections to curtailment of the defendant’s opportunity to present evidence in mitigation, he or she were required to proceed on a shortened schedule.
“The attorneys intended to, but did not, call at least the following additional witnesses: Margaret Moss (the mother of Mr. Mashburn’s childhood friend), Lewis and Sue Wyatt (Mr. Mashburn’s neighbors), Rhonda and Roger Thompson (the parents of Mr. Mashburn’s best friend), Rev. Ronnie Moore (Mr. Mash-burn’s pastor), Mickey Beandum (Mr. Mashburn’s childhood friend), Carolyn Whitley (Mr. Mashburn’s former math teacher), Adam Thompson (Mr. Mash-burn’s best friend), Jason Birchfield (Mr. Mashburn’s childhood friend), Christi Engblom (Mr. Mashburn’s ex-girlfriend), Jessica Matheny (Mr. Mash-burn’s ex-girlfriend), Lisa Abernathy, Sergeant Starr (who knew Mr. Mash-burn [in] jail), and Mavis Austin (Mr. Mashburn’s jail Bible study leader).
“Had these witnesses been called, they would have testified about their *1150 relationship with Mr. Mashburn, the life experiences of Mr. Mashburn, the environment in which Mr. Mashburn was raised. They would also have been able to testify about Mr. Mashburn’s conduct prior to drug abuse, which would have been significant in assisting the jurors to understand how someone without significant prior criminal record could have committed the crimes on October 29, 2002.
“[Trial counsel] failed to take steps to clarify the judge’s intentions on the record so that they could make and preserve for subsequent review all appropriate objections that Mr. Mashburn had to the truncation of his case in mitigation for reasons unrelated to his interests and prejudicial to his chances of obtaining a sentence less than death. [Trial counsel] made no objections to the shortening of Mr. Mashburn’s time for presenting mitigation evidence, [trial counsel] and Ms. Wardell cut the list of mitigation witnesses to fit a shortened schedule.”
(C. 57-59; footnotes omitted.)
In its order, the circuit court found this claim to be insufficiently pleaded, stating, in relevant part:
“Mashburn identifies 15 witnesses who were not called, but fails to ‘specifically proffer what [the witnesses’] testimony would have been at trial, or argue why such testimony would have caused a different result at the penalty phase or at sentencing.’ Smith [v. State, 71 So.3d 12, 24 (Ala.Crim.App.2008) ]. Mashburn does not allege sufficient facts to show that testimony by these witnesses would not have been simply cumulative to the testimony offered at trial. The Court of Criminal Appeals has noted that ‘[prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation.’ Hall [v. State ], 979 So.2d [125,] 164 [ (Ala.CrimApp.2007) ]. Further, Mashburn failed to allege sufficient facts to show that the trial court actually ‘shorten[ed] Mr. Mashbum’s time for presenting mitigation evidence.’ (Petition, ¶ 207). Indeed, Mashburn has failed to allege any facts to show that the trial court even reached any decision that he could have objected to. Consequently, this claim is summarily dismissed. Ala. R.Crim. P., 32.3, 32.6(b), 32.7(d).”
(C. 220-21.) The circuit court correctly found that this claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b).
Mashburn failed to allege any facts in his petition indicating that he was in any way forced to “truncate” his mitigation presentation as a result of one of the jurors losing a family member. Mashburn alleged that the trial court informed the affected juror only that the court would work around her needs, not that the court would shorten the trial. Mashburn did not allege that the court indicated to the juror, or more importantly, to Mashburn, that the length of time he had to present his mitigation case had to be shortened as a result of the juror’s loss. Therefore, to the extent that Mashburn claims that his counsel should have put something on the record regarding the “truncating” of his case and/or should have objected to the trial court telling the juror that it would work around her needs, he failed to plead sufficient facts indicating that counsel was ineffective in this regard.
Moreover, Mashburn alleged in his petition that trial counsel reduced the number of mitigation witnesses from 40 to 13 and, thus, did not call 27 available mitigation witnesses. However, within this claim Mashburn identified by name only 15 witnesses he said were not called, not 27. In addition, although he made a general as *1151 sertion that the witnesses would have testified “about their relationship^] with Mr. Mashburn, the life experiences of Mr. Mashburn, the environment in which Mr. Mashburn was raised [and] ... about Mr. Mashburn’s conduct prior to drug abuse,” he failed to specifically allege what each witness would have testified to had they been called to testify on his behalf. He did not allege what they would have said regarding their relationships with Mash-burn, what they would have said about Mashburn’s “life experiences,” or how they would have described Mashburn’s conduct before his drug abuse.
At various points in his initial and reply briefs on appeal, Mashburn contends that he was not required to plead in his petition what a witness would have testified to, or even to identify a witness by name. He argues that the pleading requirements in Rule 32 do not require a petitioner “to identify particular witnesses or proffer their testimony.” (Mashburn’s brief, p. 67.) This argument is incorrect. It is well settled that “[a] claim of failure to call witnesses is deficient if it does not show what the witnesses would have testified to and how that testimony might have changed the outcome.” Thomas v. State, 766 So.2d 860, 893 (Ala.Crim.App.1998), aff'd, 766 So.2d 860 (Ala.2000), overruled on other grounds by Ex parte Taylor, 10 So.3d 1075 (Ala.2005). To sufficiently plead a claim that counsel was ineffective for not calling witnesses, a Rule 32 petitioner is required to identify the names of the witnesses, to plead with specificity what admissible testimony those witnesses would have provided had they been called to testify, and to allege facts indicating that had the witnesses testified there is a reasonable probability that the outcome of the proceeding would have been different. See, e.g., Daniel v. State, 86 So.3d 405, 430 (Ala.Crim.App.2011); Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d -, - (Ala.Crim.App.2009), rev’d on other grounds, [Ms. 1091780, July 3, 2013] — So.3d-(Ala.2013); Lee v. State, 44 So.3d 1145, 1153 (Ala.Crim.App.2009); Smith v. State, 71 So.3d 12, 25 (Ala.Crim.App.2008). Mashburn failed to satisfy that burden.
Moreover, as the circuit court correctly found, Mashburn failed to plead any facts in his petition indicating that the testimony of the 15 witnesses he did identify would not have been merely cumulative to the testimony his counsel did present in mitigation. As this Court explained in Daniel, supra:
“1 “[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.” Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir.2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir.2006)).’ Eley v. Bagley, 604 F.3d 958, 968 (6th Cir.2010). ‘This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.’ United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005). ‘Although as an afterthought this [defendant’s father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.’ Darling v. State, 966 So.2d 366, 377 (Fla.2007).”
86 So.3d at 429-30.
For these reasons, Mashburn failed to plead sufficient facts to indicate that his trial counsel were ineffective in this regard, and summary dismissal of this claim of ineffective assistance of counsel was proper.
L.
Mashburn contends that the circuit court erred in summarily dismissing *1152 on pleading grounds the claim in his petition that his trial counsel were ineffective for not presenting additional mitigating evidence to support various mitigating circumstances. (Issue II.E.2. in Mashburn’s brief; Part VI.C. in Mashburn’s petition.)
“That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of pri- or counsel. As we have noted before, ‘[i]n retrospect, one may always identify shortcomings,’ Cape v. Francis, 741 F.2d 1287, 1302 (11th Cir.1984), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985), but perfection is not the standard of effective assistance.
“The widespread use of the tactic of attacking trial counsel by showing what ‘might have been’ proves that nothing is clearer than hindsight — except perhaps the rule that we will not judge trial counsel’s performance through hindsight. See, e.g., Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (‘A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.’); Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir.1992) (‘Most important, we must avoid second-guessing counsel’s performance. As is often said, “Nothing is so easy as to be wise after the event.” ’ (Citation omitted.)); White v. Singletary, 972 F.2d 1218, 1220 (11th Cir.1992) (‘Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.’); Thompson v. Wainwright, 784 F.2d 1103, 1106 (11th Cir.1986) (‘Hindsight, however, is not the appropriate perspective for a court to examine counsel’s effectiveness.’). We reiterate: ‘The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.’ Foster v. Dugger, 823 F.2d 402, 406 (11th Cir.1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988), quoted in Atkins v. Singletary, 965 F.2d at 960.”
Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir.1995). Additionally, as already noted:
“ ‘ “[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.” Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir.2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir.2006)).’ Eley v. Bagley, 604 F.3d 958, 968 (6th Cir.2010). ‘This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.’ United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005).”
Daniel v. State, 86 So.3d 405, 429-30 (Ala.Crim.App.2011).
In his petition, Mashburn divided this claim into multiple subclaims, each of which we address in turn, bearing in mind the principles above.
1.
First, Mashburn alleged in his petition that his trial counsel “failed to present medical evidence concerning the effect lack of sleep and illegal drugs can have on a person’s behavior.” (Part VI.C.xiii. in Mashburn’s petition;[12] C. 64.) He assert *1153 ed “at the time of the crime, [he] had been on methamphetamine and had slept little, if any, for four (4) to five (5) days” and “was also under the influence of prescription drugs.” (C. 64.) He also alleged that “[l]ack of sleep joined with the use of prescription drugs is likely to have an effect on one’s behavior and mental state” and that his trial counsel “failed to seek aid from a medical expert to investigate the potential effects both lack of sleep and abuse of prescription drugs would have on one’s ability to control one’s actions and think clearly.” (C. 64.) Finally, he maintained that his alleged intoxication “could have been used to negate the prosecution’s aggravating factor of robbery and burglary” and “may have influenced the jury in their consideration of the prosecution’s other aggravating factors.” (C. 64.)
This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Although Mashburn alleged that his counsel should have retained a “medical” expert, he failed to identify by name any expert who could have testified to the effects of drug use and lack of sleep or what that expert’s testimony would have been about those effects. “We have held that a petitioner fails to meet the specificity requirements of Rule 32.6(b), Ala. R.Crim. P., when the petitioner fails to identify an expert by name or plead the contents of that expert’s expected testimony.” Smith v. State, 71 So.3d 12, 33 (Ala.Crim.App.2008). See also Yeomans v. State, [Ms. CR-10-0095, March 29, 2013] — So.3d-,-(Ala.Crim.App.2013) (holding postconviction claim that trial counsel were ineffective for not obtaining expert assistance to testify regarding petitioner’s mental impairments was insufficiently pleaded where petitioner “did not identify, by name, any expert who could have presented that specific testimony — or even testified at all — at Yeomans’s trial”); Daniel v. State, 86 So.3d 405, 425-26 (Ala.Crim.App.2011) (holding postcon-viction claim that trial counsel were ineffective for not obtaining a forensic expert and a DNA expert to counter the State’s forensic and DNA experts was insufficiently pleaded where petitioner “failed to identify, by name, any forensic or DNA expert who could have testified at Daniel’s trial or the content of the expert’s expected testimony”); and Windsor v. State, 89 So.3d 805, 813-14 (Ala.Crim.App.2009) (holding postconviction claim that trial counsel were ineffective for not obtaining expert assistance was insufficiently pleaded where petitioner “did not specifically identify any experts counsel could have called and did not set forth specifically what their testimony would have been”). Therefore, Mashburn failed to plead sufficient facts to indicate that his trial counsel were ineffective in this regard, and summary dismissal of this claim of ineffective assistance of counsel was proper.
2.
Mashburn also alleged in his petition that his trial counsel were ineffective for not “connecting] the fact that ‘The Defendant Had No Significant History of Prior Criminal Activity’ and ‘The Defendant’s Relatively Young (24) At The Time of the Crime’ to explain that despite his life and crimes, Mr. Mashburn had the capacity for reform.” (Part VI.C.xiv. in Mashburn’s petition; C. 65.) In his petition, Mashburn alleged:
“At trial, the most serious prior conviction attributed to Mr. Mashburn was shooting into an unoccupied vehicle with an automatic weapon. Mr. Mashburn pled guilty to the shooting as his murder trial approached. At the time Mr. Mashburn took the plea, his half-brother Dewayne Poore was the main suspect in the shooting, and Mr. Poore faced a lengthy prison sentence if he was convicted of the crime. The only other prior violent offense admitted at trial *1154 was a claim of domestic violence in the third degree by his girlfriend Sara Jamie Cuneo. Otherwise, Mr. Mashburn’s record included possession of drug paraphernalia, various traffic offenses, and a DUI.
“Mr. Mashburn was also only twenty-four (24) years [old] at the time of the crime.
“[Trial counsel] did not argue that a sober Mr. Mashburn could have reformed and redeemed himself. Mr. Mashburn successfully detoxed while in custody, but had returned to his drugged demeanor as a result of the prescription medicines administered by the jail.
“[Trial counsel] did not introduce evidence that Mr. Mashburn had the capability for selfless action. As a child, Mr. Mashburn comforted his younger nephews as their father beat Mr. Mashburn’s half-sister, Laraine Poore. Mr. Mash-burn was also protective and caring to his cousin Crystal Duke.
“Taken together, these facts could have been used by [trial counsel] to argue that Mr. Mashburn was not irredeemable. Mr. Mashburn was young at the time of the crime; his personality was not beyond repair. Thus, if this evidence had been presented, it would have added sufficient weight to each of these twelve circumstances to make it reasonably likely that Mr. Mashburn would have been given a sentence of life without parole.”
(C. 65-66.) This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b).
Although Mashburn alleged that his counsel should have presented evidence that he comforted his nephews and was protective and caring to one his cousins, Mashburn did not allege that either his nephews or his cousin were willing and able to testify on his behalf, nor did he identify any other witnesses who would have testified to these facts. As noted above, “[a] claim of failure to call witnesses is deficient if it does not show what the witnesses would have testified to and how that testimony might have changed the outcome.” Thomas v. State, 766 So.2d 860, 893 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000), overruled on other grounds by Ex parte Taylor, 10 So.3d 1075 (Ala.2005). To sufficiently plead a claim that counsel were ineffective for not presenting evidence or not calling witnesses, a Rule 32 petitioner is required to identify the names of the witnesses, to plead with specificity what admissible testimony those witnesses would have provided had they been called to testify, and to allege facts indicating that had the witnesses testified there is a reasonable probability that the outcome of the proceeding would have been different. See Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d -, - (Ala.Crim.App.2010) (holding postconviction claim that trial counsel was ineffective for not adequately investigating and presenting certain evidence to be insufficiently pleaded where petitioner did “not identify any witnesses who could testify to the facts he claims would have benefitted him”), rev’d on other grounds, [Ms. 1091275, March 18, 2011] — So.3d -(Ala.2011).
Additionally, Mashburn made only a bare and conclusory assertion that had counsel presented this evidence “it would have added sufficient weight to each of the[ ] twelve [mitigating] circumstances to make it reasonably likely that Mr. Mash-burn would have been given a sentence of life without parole.” (C. 65-66.) However, Mashburn failed to plead any specific facts indicating how evidence of Mash-burn’s alleged kindness toward various members of his family would have been beneficial to him, especially in light of the fact that he had pleaded guilty to, and *1155 been convicted of, brutally murdering his own grandmother. Nor did Mashburn plead any facts indicating that counsel’s decision not to present such evidence was not sound strategy. See, e.g., A.G. v. State, 989 So.2d 1167, 1173 (Ala.Crim.App.2007) (holding that postconviction claim that trial counsel was ineffective for not cross-examining eight-year-old victim was insufficiently pleaded where petitioner “failed to plead any facts indicating that counsel’s decision not to cross-examine the eight-year-old victim was not sound trial strategy”).
Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
3.
Mashburn next alleged in his petition that his trial counsel were ineffective for not presenting evidence “which would have made the circumstance that ‘The Defendant had been raised in a dysfunctional family unit’ a convincing factor for mitigation.” (Part VI.C.xv. in Mashburn’s petition; C. 66.) He alleged:
“At trial, evidence of the dysfunction in Mr. Mashburn’s family was haphazardly and perfunctorily admitted.
“Ms. Wardell testified that the family had a history of mental illness, substance abuse and physical abuse. Mr. Mashburn’s half-brothers corroborated that Mr. Mashburn had suffered severe physical abuse as a child at the hand of Ellis Mashburn Sr. Ms. Wardell testified that Virginia Mashburn ignored her son’s many struggles with mental illness and substance abuse. Ms. Wardell also testified that Mr. Mashburn witnessed his half-sister being abused by her second husband. On cross-examination, Dewayne Poore stated that he felt responsible for introducing Mr. Mashburn to drugs. Joey Poore testified that when Mr. Mashburn stayed with him in Washington as a teenager, he knew that
Mr. Mashburn was on drugs but did nothing about it.
“The evidence introduced at trial only hinted at the dysfunction that pervaded Mr. Mashburn’s childhood.”
(C. 66.) This is the entirety of Mashburn’s claim in this regard and clearly fails to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b) because, among other deficiencies, Mashburn failed to identify any evidence or witnesses who could have been, but were not, presented at trial or what the content of that evidence or the testimony of those witnesses would have been, and he failed to allege any facts at all to indicate that he was prejudiced in this regard. Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
4.
Mashburn further alleged in his petition that his trial counsel were ineffective for not “detail[ing] specifics about Mr. Mash-burn’s history of drug use, which would have made the circumstance that ‘The Defendant had a history of substance abuse starting from an early age’ a more convincing factor for mitigation.” (Part VI.C.xvi. in Mashburn’s petition; C. 66.)
In his petition, Mashburn asserted that although his counsel presented evidence that he had “abused drugs from an early age — starting with huffing paint when he was eleven (11) years old,” “no evidence was presented as to why Mr. Mashburn used drugs other than to say that Mr. Mashburn was ‘escaping reality/ ” (C. 66.) Mashburn alleged in his petition a narrative regarding his drug use throughout his life. He stated in his petition that he started using drugs, specifically, taking Robitussin cough syrup, when he was 6 to 8 years old and that he began huffing paint and drinking alcohol when he was 11, but that he progressed to marijuana after he *1156 lost consciousness from huffing paint. Mashburn alleged that he suffered from “constant headaches and severe migraines” at a young age, just as both sides of his family did, and that he turned to drugs to “combat” this physical affliction. (C. 67.) Mashburn said that he also “heard voices and suffered from obsessive behavior but was denied medical treatment by his parents” and that he suffered from symptoms of Attention Deficit Disorder. (C. 68.) As a result, Mashburn alleged, he turned to drugs to alleviate his symptoms. Mashburn alleged that “at many points of his life,” as young as age 14, he recognized his problem with drugs and asked his mother for help, but that his mother failed to provide him with any help and, instead, sent him to Washington to live with his half brother Joey Poore. (C. 68.) Mash-burn said that he initially “thrived” while living with Joey, but later succumbed to the “common and prevalent” drug use at his school and was returned to his mother. (C. 68-69.)
At age 16, Mashburn said, he was introduced to cocaine and methamphetamine by his other half brother, Dewayne Poore, an ex-convict, and was led by Dewayne into a life “of drug trafficking, alcohol abuse, and excessive partying.” (C. 69.) Mashburn alleged that by age 17, he began using “LSD and other pharmaceutical drugs.” (C. 69.) Mashburn asserted that when he began dating Jamie Cuneo, who had mental-health issues, she would give him “prescription medication for free” and he used the medication to “quiet the voices in his head, to deal with his migraines, and to calm his mood swings.” (C. 69.) According to Mashburn, he was under the influence of these prescription medications at the time of the murders. Mashburn then concluded:
“At trial, the evidence of Mr. Mash-burn’s long struggles with substance abuse was cursorily and disjointedly presented. No evidence was presented that Mr. Mashburn got addicted to drugs because he was forced at a young age to self-medicate his psychiatric and physiological problems. Nor was any evidence presented that Mr. Mashburn’s substance abuse was central to the downward trajectory of his life. Most importantly, not a single piece of evidence was introduced at trial that Mr. Mashburn had been under the influence of powerful psychotropic drugs at the time of the crime.”
(C. 70.)
To the extent that Mashburn’s claim in this regard is that his counsel’s presentation of the evidence of Mashburn’s history of drug use was ineffective, Mashburn made only the bare allegation that the evidence was “cursorily and disjointedly presented,” without pleading any specific facts indicating how the evidence was presented or why he believed the presentation was ineffective.
To the extent that Mashburn’s claim in this regard is that his counsel should have presented additional evidence of his history of drug use, Mashburn failed to identify within this claim a single witness who could have provided any additional testimony at trial. See, e.g., Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d-,-(Ala.Crim.App.2009) (holding that postconviction claim that trial counsel were ineffective for not presenting evidence of petitioner’s upbringing was insufficiently pleaded where petitioner “made numerous factual allegations about his upbringing [but] never specified the name of any [witness] who would have testified at his trial to any of the allegations”), rev’d on other grounds, [Ms. 1091780, July 3, 2013] — So.3d(Ala.2013). Moreover, Mashburn made only a bare allegation that additional evidence of his history of drug use may have made his drug use a “more convincing *1157 factor for mitigation,” without pleading any specific facts indicating that had counsel presented additional evidence there is a reasonable probability that the outcome of the proceedings would have been different, i.e., that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Indeed, as already explained, “the failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.” Daniel v. State, 86 So.3d 405, 429-30 (Ala.Crim.App.2011) (citations omitted).
For these reasons, summary dismissal of this claim of ineffective assistance of counsel was proper.
5.
Mashburn next alleged in his petition that his trial counsel were ineffective for “not presenting] evidence which would have objectively demonstrated trauma to Mr. Mashburn’s brain and which would have made the circumstance that ‘[m]ental health experts opined that the Defendant had a decreased intellectual function likely caused by poly-substance abuse and alleged physical trauma, which trauma was not objectively demonstrated’ a more convincing factor for mitigation.” (Part VI. C.xvii. in Mashburn’s petition; C. 70.)
In his petition, Mashburn alleged:
“Prior to trial, Dr. Robert Shaffer, a clinical and forensic psychologist, tested Mr. Mashburn for brain damage.
“At trial, [trial counsel] presented evidence that Mr. Mashburn scored in the 2nd to 9th percentile on all of the tests Dr. Shaffer administered to him. The tests indicated that Mr. Mashburn’s ability to problem-solve, envision a sequence of events, think about two things at once, and his reaction time and awareness of his surroundings were worse than more than ninety-one percent (91%) of the population’s. Such a low score tends to indicate frontal lobe damage. The tests also indicated that Mr. Mashburn’s language, memory, and verbal expression abilities were worse than more than ninety-one percent (91%) of the population’s. This low of a score tends to indicate left temporal lobe damage. Dr. Shaffer also administered tests which indicated that Mr. Mashburn was not malingering on the other tests.
“[Trial counsel] only presented information about Mr. Mashburn’s brain functioning. Dr. Shaffer did not formally diagnose Mr. Mashburn. He did testify that frontal lobe damage can cause impulsivity and he opined that Mr. Mashburn likely had organic brain damage. He also said that it was almost impossible to say what had caused the damage, Dr. Shaffer based his opinion on the fact that Mr. Mashburn was breach birth and had thus suffered ano-xia during delivery, and that Mr. Mash-burn had gotten a concussion in a past fight.
“On cross-examination, the prosecution revealed medical records that demonstrated that Mr. Mashburn did not suffer from anoxia at birth. The prosecution also argued that medical records documenting one of Mr, Mashburn’s fights did not state that Mr. Mashburn suffered a concussion during that fight.
“[Trial counsel] presented evidence in the form of testimony by Dr. Sachy, a clinical neuropsychiatrist who evaluated Mr. Mashburn before trial. Dr. Sachy testified that Mr. Mashburn’s school records indicated that he had poor intellectual functioning. Dr. Sachy testified that in most cases, a low IQ correlates with brain damage. He said that the results of Mr. Mashburn’s MRI indicated shrinkage of Mr. Mashburn’s temporal lobe, fluid in the frontal area of his brain and scar tissue on his brain. Dr. Sachy testified that Mr. Mashburn’s *1158 brain abnormalities could be caused by brain damage, physical assault, repeated head trauma, environmental exposure to toxins, substance abuse or psychiatric disorders. Dr. Sachy testified that Mr. Mashburn has some form of bipolar disorder as well as brain damage leading to a behavior disorder.
“However, other evidence that Mr. Mashburn suffered from cognitive defects and brain trauma were not presented by [trial counsel].
“[Trial counsel] did not present additional evidence of Mr. Mashburn’s impaired cognitive function. Dr. Sachy had found Mr. Mashburn only marginally competent to stand trial. The Fol-stein Mini Mental Evaluation that Dr. Sachy administered to Mr. Mashburn showed that Mr. Mashburn suffered from age-inappropriate cognitive impairment. Dr. Sachy documented bilateral hand posturing and overflow mirror movements in his neurological exam of Mr. Mashburn. Both of these symptoms usually indicate some type of neurological abnormality.
“[Trial counsel] did not present evidence that bolstered Dr. Sachy’s diagnosis of bipolar disorder in Mr. Mashburn. They did not explain the relationship of Mr. Mashburn’s psychiatric disease to his crime. Children with bipolar disorder, the disease Dr. Sachy diagnosed Mr. Mashburn as suffering from, are known to hear voices, as Mr. Mashburn has throughout his life. Children with bipolar disorder often begin abusing substances at an early age to cope with their psychiatric symptoms as Mr. Mashburn did. Bipolar disorder also causes impulsivity and episodic extreme dyscontrol, which can lead to unpredictable, involuntary combative behavior.
“[Trial counsel] did not present evidence that Mr. Mashburn’s early substance abuse could have caused long-term physical damage that was correlated to his crime. Chronically huffing paint and gasoline deprives the brain of oxygen, kills brain cells, and causes long term effects including impaired judgment, a lack of inhibitions, impulsive and strange behavior, and increased aggression. Mr. Mashburn huffed paint and gasoline often in his early adolescence.
“[Trial counsel] did not present additional evidence about Mr. Mashburn’s verifiable brain damage or explain the relationship of his brain damage to his behavior, life trajectory and crime. Mr. Mashbum’s MRI’s demonstrated early temporal lobe atrophy, a condition that is associated with increased violence and aggression due to decreased blood flow to the brain. Frontal-temporal lobe damage, which Mr. Mashburn’s MRI demonstrates he has, diminishes the brain’s ability to exercise the executive functions necessary to organize experiential information and formulate contextually appropriate behavioral responses. Brain damage can also affect the individual’s ability to feel empathy and conform to social restraints. People with brain damage are especially prone to behavioral dyscontrol when they are fatigued, confused or overstimulated, a medical fact that is particularly relevant in light of the fact that Mr. Mashburn had slept little, if at all, for four (4) to five (5) days at the time of the crime.”
(C. 70-73.)
Again, although Mashburn alleged that counsel should have presented additional evidence of his cognitive impairments, he failed to identify a single expert or lay witness who could have, or would have, testified to the additional evidence Mash-bum alleged should have been presented, nor did he plead specifically what those unidentified witnesses’ testimony would have been. As already noted, in order to satisfy the requirements in Rule 82.3 and *1159 Rule 32.6(b), a Rule 32 petitioner must identify by name the witnesses he believed should have been called to testify and must plead with specificity what the testimony of those witnesses would have been. Mashburn failed to make these essential factual allegations. Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
6.
Finally, Mashburn alleged in his petition that his trial counsel were ineffective for “not presenting] visual evidence which would have made the circumstance that ‘The Defendant is loved by his family1 a more convincing factor for mitigation.” (Part VI.C.xviii. in Mashburn’s petition; C. 73.) Mashburn asserted:
“At trial, family members and mitigation specialist Susan Wardell testified that Mr. Mashburn and his grandmother [the victim] had an extremely close relationship, and that Mr. Mashburn was Mrs. Birmingham’s favorite grandson. Mr. Mashburn’s half-brother Dewayne Poore testified that if Mr. Mashburn were to receive the death penalty, it would almost certainly be a death sentence for their mother, Virginia Mash-burn, as well. On the stand at trial, Mr. Mashburn’s mother begged the jury to spare her son’s life. She had already lost her mother and could not bear to lose her son as well.
“[Trial counsel] did not present other evidence that Mr. Mashburn is loved by his family, and was loved by his grandmother, Eva, who was one of the victims.
“[Trial counsel] also did not introduce evidence demonstrating the depth of Virginia Mashburn’s anguish and pain at her mother’s murder and her child’s execution.
“There is significant video evidence of Mr. Mashburn in a loving family setting, demonstrating his affection for his family members, and their affection for him. These Videos, which [trial counsel] failed to introduce, also include interactions Mr. Mashburn had with Ms. Birmingham.”
(C. 73-74.)
Although Mashburn alleged that his trial counsel should have presented additional evidence that he was loved by his family, he failed to specifically identify what evidence he believed should have been presented and, again, failed to identify a single witness he believed could have provided that evidence. Mashburn also failed to identify what evidence he believed his counsel should have presented, or even could have presented, that would have possibly been able to “demonstrate] the depth of’ his mother’s suffering as a result of losing her mother at the hands of her own son. Finally, Mashburn alleged that video evidence of his “loving” interactions with his family should have been presented, but he made no more than the generalized assertion that the evidence showed him in a “family setting” and showed the “affection” between him and his family.[13] He failed to specifically identify what the content of the video evidence was, and he failed to allege any facts indicating how this video evidence would have been beneficial to him, especially in light of the fact that he had pleaded guilty to, and had been convicted of, brutally murdering his own grandmother. Nor did Mashburn plead any facts indicating that counsel’s decision not to present the video evidence was not sound strategy. See, e.g., A.G. v. State, 989 So.2d 1167, 1173 (Ala.Crim.App.2007) (holding that postconviction claim *1160 that trial counsel was ineffective for not cross-examining eight-year-old victim was insufficiently pleaded where petitioner “failed to plead any facts indicating that counsel’s decision not to cross-examine the eight-year-old victim was not sound trial strategy”).
Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper.
M.
Finally, Mashburn contends that the circuit court erred in summarily dismissing on pleading grounds the claim in his petition that his trial counsel were ineffective for not objecting to statements made by the prosecutor during the penalty phase of the trial that, Mashburn alleged, nullified the effect of his mitigation evidence. (Issue II.F. in Mashburn’s brief; Part VI.D. in Mashburn’s petition.)
In his petition, Mashburn alleged:
“In the prosecution’s closing argument, it argued, T bet you could look around this courtroom and you’re going to find some people that’s been through a heck of a lot worse than what Mr. Mashburn went through, but they didn’t kill anybody and they certainly didn’t kill their grandmother and step grandfather.’
“The prosecution also stated, You know we’ve all known people who have had problems like this. There’s not anybody that might have been abused part of his life, physically, sexually in some way, and that’s a horrible thing to have happen to you. We all know people who have been addicted to drugs. A number of folks have been addicted to drugs who aren’t necessarily looking to feel normal, they are looking to feel good. That’s what drugs are all about. They get hooked on that. We’ve all seen those kind of people. That doesn’t mean that is an automatic connection between those problems and somebody killing somebody.’
“In making these arguments during counsel’s summation, the prosecution violated the Eighth Amendment by effectively nullifying the effect of the mitigating evidence that was presented at trial. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11 Commentary p. 1068-69, (stating counsel should object to arguments that improperly minimize the significance of mitigating evidence); see also ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11 Commentary p. 1069 n. 315 (2003) (‘Prosecutors will frequently try to argue, for example, that “not everybody” who is abused as a child grows up to commit capital murder or that mental illness did not “cause” the defendant to commit the crime. Both of these arguments are objectionable on Eighth Amendment grounds because they nullify the effect of virtually all mitigation.’).
“In the penalty phase of trial, jurors must consider the social and background information relating to the defendant to aid in their decision of whether to grant mercy. See Haney, Craig, The Social Context of Capital Murder; Social Histories and the Logic of Mitigation, 35 SANTA CLARA L. REV. 547, 603 (1995). Allowing the ‘not everybody’ argument to be made during closing arguments essentially ‘render[s] all forms of mitigation irrelevant and accomplish[es] precisely the kind of categorical denial of mercy that modern capital sentencing schemes are designed to avoid.’ Id.
“By failing to object to these arguments, [trial counsel] deviated from the general standard required of capital defense attorneys and failed to provide effective counsel in violation of Mr. Mashburn’s constitutional rights. If *1161 [trial counsel] had objected to these statements, the jury would not likely have been allowed to hear or consider prosecution’s ‘not everybody’ argument which essentially nullified the effect of mitigating evidence and the outcome of Mr. Mashburn’s trial would have likely ended in him receiving life without parole.”
(C. 74-76; footnotes omitted.) This claim was not pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b).
“This court has stated that ‘[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff’d, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff’d, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bank-head, 585 So.2d at 106.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000) (emphasis added), aff’d, 814 So.2d 970 (Ala.2001).
Although Mashburn alleged the specific statements made by the prosecutor that he believed were objectionable, he failed to plead any facts indicating the context in which those statements were made. See, e.g., Moody v. State, 95 So.3d 827, 846-49 (Ala.Crim.App.2011) (holding that petitioner failed to sufficiently plead that counsel were ineffective for not raising on appeal claims that the prosecutor made improper arguments to the jury where petitioner failed to plead facts indicating context in which the arguments were made). In addition, Mashburn made only a conclusory allegation that he was prejudiced by these prosecutorial comments — stating simply that had the jury not heard these arguments, he likely would have received a sentence of life imprisonment without the possibility of parole. However, he failed to plead any facts to support this concluso-ry allegation. It is well settled that statements of counsel are not evidence, see, e.g., Armstrong v. State, 516 So.2d 806, 809 (Ala.Crim.App.1986) (“The prosecutor’s statements are not evidence.”), and Mashburn failed to plead any facts indicating that the nine statements by the prosecutor that he believed were improper actually had any impact on the jury at all, much less that there was a reasonable probability that the jury would have returned a different verdict but for hearing those nine statements.
Moreover, contrary to Mashburn’s contention, merely because the American Bar *1162 Association (“ABA”) Guidelines suggest objecting to arguments similar to the arguments allegedly made by the prosecutor here does not mean that trial counsel were ineffective for making no such objection. As this Court explained in Ray v. State, 80 So.3d 965 (Ala.Crim.App.2011):
“We have held that the ABA Guidelines may ‘provide guidance as to what is reasonable in terms of counsel’s representation, [but] they are not determinative.’ Jones v. State, 43 So.3d 1258,1278 (Ala.Crim.App.2007).
“The danger of adopting the ABA Guidelines as determinative on the issue of a lawyer’s effectiveness was discussed by the United States Court of Appeals for the Fourth Circuit:
“ ‘[T]o hold defense counsel responsible for performing every task that the ABA Guidelines say he “should” do is to impose precisely the “set of detailed rules for counsel’s conduct” that the Supreme Court has long since rejected as being unable to “satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.” Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052. Such a categorical holding would lead to needless and expensive layers of process with the unintended effect of compromising process.... Recognition of the ABA Guidelines as the minimum prevailing community standard would transform defense lawyers’ judgments into mindless defensive reactions to a potential habeas claim, divorced from the individualized needs of professional representation. Those needs call for more nuanced responses than can be provided by following preestablished mechanical rules of representation....
“‘While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as part of the overall calculus of whether counsel’s representation falls below an objective standard of reasonableness; they still serve only as “guides,” Strickland, 466 U.S. at 688, not minimum constitutional standards.’
“Yarbrough v. Johnson, 520 F.3d 329, 339 (4th Cir.2008).”
80 So.3d at 982 (footnote omitted). Although the ABA Guidelines cited by Mash-burn indicate that an objection in the situation alleged here would have been proper, it is nonetheless well settled that “the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.” Mitchell v. State, 84 So.3d 968, 1001 (Ala.Crim.App.2010). Based on Mashbum’s bare pleadings, it appears to this Court that the prosecutor’s statements were proper arguments urging the jury to give Mashburn’s mitigating evidence little or no weight.
For these reasons, summary dismissal of this claim of ineffective assistance of counsel was proper.

Conclusion

For the reasons stated above, the circuit court’s summary dismissal of Mashburn’s Rule 32 petition was proper. Therefore, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH, BURKE, and JOINER, JJ., concur. WINDOM, P.J., recuses herself.

. This Court may take judicial notice of its own records. See Nettles v. State, 731 So.2d 626, 629 (Ala.Crim.App.1998), and Hull v. State, 607 So.2d 369, 371 n. 1 (Ala.Crim.App.1992).

. In their respective briefs, both parties state that a status conference was conducted on March 3, 2010, via telephone. The record does not contain a transcript of that conference. Although Mashburn states in his brief that he informed the circuit court at the status conference that he wanted to file a response to the State’s answer and motion to dismiss, *1114 he does not argue that the circuit court prohibited him from doing so.

. Recently, in Ex parte Beckworth, [Ms. 1091780, July 3, 2013] - So.3d - (Ala. 2013), the Alabama Supreme Court "granted certiorari review to consider whether a Rule 32 petitioner has a duty to plead facts negating the affirmative defenses of preclusion under Rule 32.2(a)(3) and (5), Ala. R.Crim. P. (claims that could have been, but were not, raised at trial or on appeal, respectively).” — So.3d at-. Stated another way, the issue in Ex parte Beckworth was
"whether a petition grounded on Rule 32.1(a) must plead facts tending to negate the affirmative defenses of preclusion under Rule 32.2(a)(3) and (5) in order to survive summary dismissal under Rule 32.7(d). More specifically, must a petition allege facts indicating that the claim could not have been raised at trial or on appeal in order to ‘state a claim' under Rule 32.1(a).”
- So.3d at -. The Alabama Supreme Court held that a Rule 32 petitioner has no burden to plead facts in his or her petition negating the preclusions in Rules 32.2(a)(3) and (a)(5) in order to sufficiently plead a constitutional claim under Rule 32.1(a). Although the Supreme Court's holding in this regard invalidates this Court’s statement in Jenkins that a Rule 32 petitioner must plead facts in his or her petition "to overcome the procedural bars contained in Rule 32.2, Ala. R.Crim. P.,” as it applies to Rules 32.2(a)(3) and (a)(5), Jenkins, 105 So.3d at 1244, it has no effect on this Court's holding in Jenkins that a circuit court may summarily dismiss a Rule 32 petition without first receiving from the petitioner a reply to the State’s response.

. To the extent that Mashburn intended to challenge any statement in the circuit court's order other than the statement he cites in his brief, he has failed to comply with Rule 28(a)(10), Ala. R.App. P., which, as already noted, requires that an argument contain "the contentions of the appellant/petitioner with ' respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.”

. As explained in note 3, supra, in Ex parte Beckworth, [Ms. 1091780, July 3, 2013] - So.3d-(Ala.2013), the Alabama Supreme Court held that a Rule 32 petitioner has no burden to plead facts in his or her petition negating the preclusions in Rules 32.2(a)(3) and (a)(5) in order to sufficiently plead a constitutional claim under Rule 32.1(a).
However, we do not hold here that Mashburn failed to sufficiently plead his Brady claim. Rather, we hold that, based on the record from Mashbum's direct appeal, it is clear that Mashburn’s Brady claim is precluded by Rule 32.2(a)(5). Therefore, the holding in Ex parte Beckworth, dealing solely with a petitioner’s burden of pleading, is not applicable here.

. Section 13A-5-42 provides:
"A defendant who is indicted for a capital offense may plead guilty to it, but the state must in any event prove the defendant's guilt of the capital offense beyond a reasonable doubt to a jury. The guilty plea may be considered in determining whether the state has met that burden of proof. The guilty plea shall have the effect of waiving all non-jurisdictional defects in the proceeding ,resulting in the conviction except the sufficiency of the evidence. A defendant convicted of a capital offense after pleading guilty to it shall be sentenced according to the provisions of Section 13A-5-43(d).”
(Emphasis added.)

. Section 13A-3-23 was amended effective June 1, 2006. Act No. 2006-303, Ala. Acts 2006.

. Mashburn also alleged within this claim in his petition that his trial counsel did not take reasonable steps to "advocate” that Mashburn stop receiving his medication before trial. (C. 46.) We address that claim separately, in Part III.J. of this opinion.

. Although in its order, the circuit court treated this claim as it relates to the private investigators as a claim relevant to the guilt phase of the trial, it was included within that part of Mashburn’s petition raising penalty-phase claims of ineffective assistance of counsel, and Mashbum specifically states in his brief on appeal that his claim, even as it relates to private investigators, was intended to apply only to the penalty phase of the trial.

. See Part II of this opinion.

. One of the subclaims was Mashburn’s claim that his trial counsel did not take reasonable steps to "advocate" that Mashburn stop receiving his medication before trial. (C. 59.) We addressed that claim separately, in Part III J. of this opinion.

. In Part VI.C. of his petition, Mashburn's subclaims begin with the Roman numeral "xiii." However, there are no subclaims numbered i through xii.

. We note that this is the same family Mash-bum said subjected him to physical and psychological abuse, refused to provide him with medical treatment, and ultimately forced him to turn to drugs.